# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2015-CA-00570-COA

**JOSE HOSS SERIO**                                                                 **APPELLANT**

**v.**

**MELISSA SERIO**                                                                     **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 01/10/2015 |
| TRIAL JUDGE: | HON. HOLLIS MCGEHEE |
| COURT FROM WHICH APPEALED: | ADAMS COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | R. KENT HUDSON |
| | WILLIAM ABRAM ORLANSKY |
| | SUSAN LATHAM STEFFEY |
| ATTORNEY FOR APPELLEE: | DAVID BRIDGES |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| TRIAL COURT DISPOSITION: | AWARDED ALIMONY TO APPELLEE |
| DISPOSITION: | AFFIRMED IN PART AND REVERSED AND REMANDED IN PART – 10/18/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE IRVING, P.J., BARNES AND GREENLEE, JJ.

### IRVING, P.J., FOR THE COURT:

¶1.     On January 13, 2015, the Chancery Court of Adams County granted Jose Serio and Melissa Serio a divorce on the ground of irreconcilable differences and, after dividing the marital estate, awarded permanent alimony to Melissa.  Feeling aggrieved, Jose appeals and asserts that the chancery court manifestly erred in (1) computing Jose's taxable income, (2) awarding Melissa permanent alimony, (3) classifying a bank account as nonmarital property, and (4) not classifying a tax liability as marital debt and requiring Melissa to bear a portion of the responsibility for its payment.

¶2.     We find error in the chancery court's classification of the bank account as Melissa's separate property.  Therefore, we reverse the judgment of the chancery court and remand for further proceedings.

FACTS

¶3.     Jose and Melissa were married on August 18, 1995, in Baton Rouge, Louisiana.[1] They have two children together: Carmen Elise Serio, born February 23,1999, and Carrie Maria Serio, born September 5, 2001.  During the first two years of their marriage, Jose and Melissa lived in Baton Rouge, where Jose worked at a rehabilitation hospital, and Melissa completed her licensed practical nurse (LPN) studies.  In 1997, they moved to Natchez, Mississippi, where Jose worked nights and weekends while obtaining a master's degree and training to become a nurse practitioner.  Jose became a licensed nurse practitioner in May 2001.

¶4.     The couple separated in February 2013.  On September 13, 2013, Melissa filed a complaint for divorce on the grounds of uncondoned adultery, habitual cruel and inhuman treatment, or, in the alternative, irreconcilable differences.  Jose answered Melissa's complaint for divorce and filed a counterclaim for divorce on the grounds of adultery or, in the alternative, irreconcilable differences.  In her response to Jose's counterclaim, Melissa denied that she had committed adultery but admitted that Jose was entitled to a divorce on

_____

[1] Jose and Melissa met at Hinds Community College, where Jose was attending nursing school.

the ground of irreconcilable differences.

¶5.    On August 26, 2014, the parties entered a consent to divorce on the ground of irreconcilable differences.  At that time, the parties also agreed for the chancery court to decide (1) all issues regarding the custody, care, visitation, and financial matters surrounding the minor children, (2) the equitable distribution of the parties' marital estate, and (3) the entitlement of either party to attorney's fees, alimony, and the amount thereof.  During a three-day trial, occurring October 13-15, 2014, both Melissa and Jose testified.[2]  The only other testimony came from Jose's expert witness and certified public accountant Sim Mosby.  On November 17, 2014, the chancellor issued his letter opinion, which was later incorporated into the final judgment.  In the final judgment, the chancellor awarded Melissa permanent alimony in the amount of $6,400 per month.  The chancellor also classified Melissa's United Mississippi Bank account (UMB account) as her separate property and awarded the account to her.  Additionally, the chancellor assigned responsibility to Jose for all taxes, penalties, and interest owed on Jose's 2013 tax return.  Both parties filed post-judgment motions to alter and amend the judgment, which were denied.  Jose has appealed.

## DISCUSSION

¶6.    "Our scope of review in domestic relations matters is limited.  [Appellate courts] will not disturb the findings of a chancellor unless the chancellor was manifestly wrong, clearly erroneous or an erroneous legal standard was applied."  *Ferguson v. Ferguson,* 639 So. 2d

---

[2] Their daughters also testified, but it was outside of the court proceedings.

921, 930 (Miss. 1994) (internal citation and quotation marks omitted). However, "[appellate courts] review[] questions of law de novo. And, after review, if warranted, [appellate courts] will reverse the lower court because of an erroneous interpretation or application of the law." *Brooks v. Brooks,* 652 So. 2d 1113, 1117 (Miss. 1995).

I. *Jose's Income*

¶7. Testimony revealed that Jose's income was derived from various sources. He had worked for Internal Medicine Associates (Internal Medicine) since 2003. In addition, he is a part-owner of two after-hours medical clinics, Natchez After-Hours Clinic (Natchez Clinic) and Oxford After-Hours Clinic (Oxford Clinic). He received income from these clinics, both as a moonlighting practical nurse and as a part owner. Jose testified that he has the following sources of income: (1) $6,000 per month in pre-tax salary from Internal Medicine; (2) an annual bonus from Internal Medicine, which equals eighteen percent of every dollar over $200,000 he collects for the fiscal year; (3) distribution checks from the Natchez Clinic, in which he owns a twenty-one and one-fourth percent stake; (4) income from moonlighting at the Natchez Clinic; and (5) distribution checks from the Oxford Clinic, in which he owns a twenty-two and one-half percent stake. Aside from a small amount that is distributed for the purposes of paying taxes, the distribution checks that Jose receives from the Oxford Clinic are currently being reinvested in the business to pay off the clinic's debt. In 2013, Jose received $10,000 from the Oxford Clinic to be utilized for taxes. The chancellor determined that "Jose's gross income [had] remained steady from 2012-14: between $22,036-[$]24,955

4

per month, on average" and that "Jose's after-tax income [had] likewise been reasonably steady during [that] time period and [at the time of trial was] approximately $15,700 per month plus the non-distributed income from [the Oxford Clinic]." During discussion of the alimony award, we will discuss in more detail the testimony, calculations, and projections involved in arriving at Jose's income, which forms the basis for the chancellor's award of alimony to Melissa.

## II.    Alimony Award

¶8.    Jose argues that the chancellor's alimony award to Melissa, both in terms of the monthly amount and its permanent nature, constitutes manifest error. More specifically, Jose contends that Melissa should be receiving less than $6,400 per month and that the alimony, if any, should be rehabilitative instead of permanent. Jose asserts that the amount awarded for alimony was based on an erroneous factual finding as to his after-tax income and an improper application of the law to the evidence presented at trial.

¶9.    In awarding alimony to Melissa, the chancellor followed the factors set forth in *Armstrong v. Armstrong,* 618 So. 2d 1278, 1280 (Miss. 1993). The court found that Melissa had a gross monthly income of $3,503 and monthly net income of $2,853. The chancellor found that Jose's monthly net income was $15,700, not including his Oxford Clinic distributions.[3] As stated, the chancellor found that Jose's gross income, ranging from

_____

[3] While the chancellor did not include Jose's Oxford Clinic distributions, he did address them, stating that the Oxford Clinic's "profits were available for the shareholders to spend however they liked." The chancellor further stated that the fact that Jose and the

5

between $22,036 to $24,955 per month, had remained steady from 2012 to 2014, and that his after-tax income had been "reasonably steady during that time period" at $15,700 per month—without adding the non-distributed income from the Oxford Clinic.

¶10.    "Mississippi precedent establishes that the chancellor's award of alimony 'is a matter primarily within the discretion of the chancery court because of its peculiar opportunity to sense the equities of the situation before it.'" *Flechas v. Flechas,* 724 So. 2d 948, 953 (¶14) (Miss. 1998) (quoting *Tilley v. Tilley*, 610 So. 2d 348, 351 (Miss. 1992)).   A chancellor's award of alimony "will not be disturbed on appeal unless it is found to be against the overwhelming weight of the evidence or manifestly in error."  *Tilley,* 610 So. 2d at 351. "Under the standard of review utilized to review a chancery court's findings of fact, particularly in the areas of divorce, alimony and child support, [appellate courts] will not overturn the court on appeal unless its findings were manifestly wrong."  *Id.* (internal citations omitted).  Alimony should be considered when "an equitable division of marital property, considered with each party's nonmarital assets, leaves a deficit for one party." *Johnson v. Johnson,* 650 So. 2d 1281, 1287 (Miss. 1994).

¶11.    After analyzing the parties' living expenses, the chancellor found that Melissa's personal living expenses, excluding children's expenses, would equal $8,379.30. In addition, the chancellor determined that Jose would still have $2,690 available to him each month after

---

other shareholders chose to use their wages and salaries from the Oxford Clinic as debt repayment did not change the fact that it was income.

paying all his obligations and expenses. The chancellor stated: "This award of alimony [in the amount of $6,400 per month] will not equalize the parties' income. Jose will still have significantly more after-tax income available to him than Melissa."

¶12. Jose argues that the amount of $6,400 monthly should be reversed because the chancellor erroneously based the award amount on Jose having an after-tax income of $15,700. Jose contends that the chancellor should have used his income at the time of trial, which was his prorated 2014 income, instead of his income from 2013, which was ten months earlier. He argues that his 2014 post-tax income was significantly lower than the $15,700-per-month figure on which the chancellor based his award. He also asserts that, even using Melissa's projected 2014 amounts—yielding a tax liability of $74,964.15, an annual income of $153,794.32, and a monthly income average of $12,816.19—would still place his financials roughly $3,000 less than the amount that the chancellor used to calculate his alimony obligation and would leave him with a $310 monthly deficit. Additionally, Jose notes that the chancellor's calculation does not include Jose's tax debt of approximately $76,000 for the tax year 2013. He further argues that the chancellor should have based his findings on Mosby's projections in arriving at a determination about Jose's future earnings because it is unlikely that Jose will be able to continue to work three weekends per month because of his scheduled weekend visitations with his daughter. Jose asserts that it is inappropriate to impose a requirement of such extra work to meet his alimony obligations.

¶13. In addition, Jose argues that the chancellor's decision to attempt to "equalize" the

parties' monthly incomes through alimony was inappropriate. Citing *Ferguson v. Ferguson,* 639 So. 2d 921, 929 (Miss. 1993), Jose alleges that the division of marital property and a decision on alimony should be made in tandem, and "where one expands, the other must recede." Consequently, Jose asserts that the chancellor's alimony award to Melissa actually grants her in perpetuity an equitable distribution of his future estate.

¶14. Mosby estimated Jose's pre-tax and after-tax incomes for 2014 to be $199,281 and $133,976, resulting in an after-tax monthly income of $11,165. Mosby's gross, pre-tax estimate of $199,281 was reached using the following numbers: (1) $72,000 in gross salary from Internal Medicine; (2) $38,823 in bonuses from Internal Medicine, all of which Jose had already received through September 2014; (3) $13,440 from moonlighting at the Natchez Clinic, which was based on an average of one weekend of moonlighting per month; and (4) $75,018 in distributions from the Natchez Clinic. However, Mosby did not include the distributions from the Oxford Clinic.[4] On cross-examination, Mosby agreed that if he had used a different method of proration than the one that he used, Jose's distribution from the Natchez Clinic in 2014 could be projected at $75,443.88 instead of $75,018. Also, Mosby agreed that Jose had actually earned a little over $31,000 from moonlighting at the Natchez Clinic, averaging three weekends per month, and using that figure would project Jose's total income from moonlighting to $42,491.59 instead of the $13,440 that Mosby had used based

---

[4] Mosby testified that he was asked not to include the distributions from the Oxford Clinic because they were not cash distributions.

on Jose working only one weekend per month, rather than three.

¶15.   In response, Melissa contends that the chancellor did not err in his calculations of Jose's gross income. Melissa contends that the chancellor's opinion did in fact include a discussion of Jose's 2014 income. Melissa further contends that Jose declined the opportunity to present additional evidence of his 2014 income, and the record validates that contention.

¶16.   Based on the considerable discretion that a chancellor has in making factual determinations, this Court cannot say that the chancellor erred in determining the amount of Jose's income. This is especially true since the chancellor did not consider the income that Jose received from the Oxford Clinic. The fact that Jose and his partners decided to use their prorated profits from the Oxford Clinic mostly to retire the debt against the clinic did not mean that the chancellor could not consider the distributions that Jose was entitled to in considering the amount of income available to Jose. This issue is without merit.

¶17.   Jose also argues that the chancellor erred in granting Melissa permanent alimony instead of rehabilitative alimony. As stated above, the chancellor followed the factors set forth in *Armstrong* in determining that an award of alimony to Melissa was warranted. It is well settled:

> The purpose of permanent alimony is to be a substitute for the marital-support obligation. The award of permanent periodic alimony arises from the duty of the husband to support his wife. We also have said that the husband is required to support his wife in the manner to which she has become accustomed, to the extent of his ability to pay. To update our language: Consistent with *Armstrong*, a financially independent spouse may be required

9

to support the financially dependent spouse in a manner in which the dependent spouse was supported during the marriage, subject to a material change in circumstances.

*Rogillio v. Rogillio,* 57 So. 3d 1246, 1250 (¶11) (Miss. 2011).  On the other hand:

Rehabilitative alimony is awarded to parties who have put their career on hold while taking care of the marital home.  Rehabilitative alimony allows the party to get back into the working world in order to become self-sufficient.  [It] is an equitable mechanism which allows a party needing assistance to become self-supporting without becoming destitute in the interim.

*Lauro v. Lauro,* 847 So. 2d 843, 849 (¶15) (Miss. 2003).

¶18.    When addressing the length of the marriage, the chancellor referenced Professor Deborah Bell's treatise, *Bell on Mississippi Family Law* (2d ed. 2011), noting that Bell has found that "permanent alimony was awarded in about half of [the] marriages lasting from [ten to nineteen] years, and in 70% of marriages of twenty years or more."  Further, quoting Bell, the chancellor stated:

First, income disparity is required for an award but does not automatically guarantee an award.  Second, once a disparity is shown, the length of marriage is of great importance. . . . Third, the amount of [the] alimony award appears to increase with the length of the marriage.  Awards ranged from one-fourth of the disparity in short marriages to awards that equalized or more than equalized incomes after long marriages.

Bell at § 9.06[6].  The chancellor also noted the ages of the parties: (1) Melissa was forty-seven years old at the time of trial, and (2) Jose was forty-four years old at the time of trial. The chancellor expressed that it would be difficult for Melissa to reenter the workforce as an LPN at her age.  Additionally, in his order overruling Jose's post-trial motion to alter or amend the judgment, the chancellor stated:

10

The Court's decision to award permanent periodic alimony as set forth in the final judgment was made after considering several factors, not the least of which was the fact that Melissa made substantial contributions throughout the marriage, both economic and non-economic. Considering the significant disparity in the parties' income[s], that Mr. Serio's monthly income available after payment of all of his court-ordered obligations and personal expenses is similar to Melissa's monthly earned income, and that Mr. Serio's employment and earnings opportunities are trending upward, the [c]ourt declines to reconsider its alimony award.

¶19. Jose argues that the evidence presented at trial favors rehabilitative alimony. He contends that the length of the marriage should be considered neutral at best, stating that nineteen years is neither a very short nor a very long marriage. Jose also contends that the *Armstrong* factor addressing the parties' health and earning capacity should have been given more weight. Jose states that both parties are in good health and employable, despite the chancery court asserting that Melissa would have a difficult time reentering the workforce. We cannot find the chancellor in error, as he considered the applicable law regarding alimony after he equitably divided the marital estate and determined that periodic, rather than rehabilitative, alimony was warranted.

### III. Melissa's UMB Account

¶20. Jose argues that the chancery court erred in classifying the $24,682.98 in Melissa's UMB account as separate property instead of marital property. Jose contends that the chancery court's finding— that Melissa testified without contradiction that the March 2014 deposit of $47,160.94 into her UMB account came from her inheritance from her late mother—is factually incorrect. Jose submits that Melissa offered no such testimony and that

11

by the end of 2012, Melissa could have had only $26,000 of the inheritance left, calculated as follows: the original inheritance of $40,000 received in 2010, minus the $10,000 utilized for the down payment on the home and $4,000 for a gun that Melissa purchased.[5] Jose also points out that if Melissa's inheritance money was ever in the UMB account, it was entirely gone by 2014 because the account had a negative balance before the March 2014 deposit. Jose further argues that the deposit did not come from Melissa's inheritance but, rather, from money that she withdrew from the parties' joint account during the first half of 2013.

¶21. Our review of the record supports Jose's contention that Melissa's UMB account had a negative balance before the $47,160.94 was deposited into it on March 26, 2014. "Because assets owned by a spouse are presumed to be marital property, the party seeking to classify property as separate, or non-marital, bears the burden of tracing the asset to a separate-property source." *Allgood v. Allgood,* 62 So. 3d 443, 447 (¶13) (Miss. Ct. App. 2011). When questioned about the UMB account, Melissa testified that "it was [from] money given to [her] once [her] mother passed away" but did not explain how she could have made a deposit of $47,160.94 on March 26, 2014, when she had received only $40,000 in the inheritance in 2010, and has expended $14,000 of that amount. Nor did she explain how the account could have reflected a negative balance prior to the March 26, 2014 deposit. Because we find a lack of substantial evidence to support the chancellor's finding that the $24,682.98 that was in Melissa's UMB account was her separate property, we reverse the

---

[5] Melissa testified to these expenditures.

judgment of the chancery court on this issue and remand the case with directions to reconsider the division of the marital estate, counting the $24,682 as marital property.

IV. *The 2013 Tax Debt*

¶22. Jose contends that the chancellor erred in not classifying his 2013 tax liability as a marital obligation and making Melissa responsible for paying a portion of it. More specifically, Jose argues that Melissa was the one that normally handled the payment of his estimated quarterly taxes and that, after their separation, he "continued allowing Melissa to deposit his paychecks into the joint account because he expected the parties' usual practice of Melissa controlling the money and paying all bills to continue." According to Jose, Melissa, rather than following the usual practice, filed her taxes separate from him and unilaterally claimed both children as dependents for the 2013 tax year. Jose further points out that one estimated quarterly tax payment was due before he separated from Melissa and that a second one was almost due.

¶23. The chancellor found that Jose left Melissa in early March 2013 and had completely segregated his "checks and accounts" from Melissa by mid-May. The chancellor further found that, according to Mosby, "the $76,170 tax bill consisted primarily of the unpaid taxes on Jose's share of the income from the Oxford and Natchez clinics and that Jose had been paid $10,000 from the Oxford Clinic for the purpose of paying estimated taxes, but instead he pocketed the money." The chancellor ultimately found that, notwithstanding Jose's voluntary payment to Melissa of $8,000 per month for the remainder of 2013, he still had the

13

rest of his money to spend as he desired and simply chose not to pay his quarterly tax estimates for the 2013 tax year. Consequently, the chancellor determined that Jose should be responsible for his entire 2013 tax liability. Given our deferential standard of review, we cannot say that the chancellor erred in that determination.

¶24.    In conclusion, we also point out that on remand, the chancery court should determine whether the expenditure of the $22,477.96—the March 26, 2014 deposit of $47,160.94 minus the remaining balance of $24,682.98—was made for marital purposes. If it was not expended for marital purposes, then Melissa should be charged with having dissipated $22,477.96 in marital assets and the appropriate credits and adjustments made accordingly. Finally, since we are reversing and remanding for a reclassification of marital property, it necessarily follows that both the equitable division of the marital estate and the award of alimony should be revisited.

¶25.    **THE JUDGMENT OF THE CHANCERY COURT OF ADAMS COUNTY IS AFFIRMED IN PART AND REVERSED AND REMANDED IN PART FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED EQUALLY TO THE APPELLANT AND THE APPELLEE.**

**LEE, C.J., GRIFFIS, P.J., BARNES, ISHEE, CARLTON, WILSON AND GREENLEE, JJ., CONCUR.   JAMES, J., CONCURS IN PART WITHOUT SEPARATE WRITTEN OPINION.  FAIR, J., NOT PARTICIPATING.**