## IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

### NO. 2016-CA-00537-COA

SONJA RENEE BAGGETT                                          APPELLANT

v.

JAMES DARRELL BAGGETT                                          APPELLEE

DATE OF JUDGMENT:             03/08/2016
TRIAL JUDGE:                  HON. FRANKLIN C. MCKENZIE JR.
COURT FROM WHICH APPEALED:    WAYNE COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:       CAROL ANN ESTES BUSTIN
ATTORNEYS FOR APPELLEE:       RISHER GRANTHAM CAVES
                              TERRY L. CAVES
NATURE OF THE CASE:           CIVIL - DOMESTIC RELATIONS
DISPOSITION:                  AFFIRMED - 11/07/2017
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**IRVING, P.J., FOR THE COURT:**

¶1.    Renee Baggett filed a complaint for divorce from her husband James Baggett on the

bases of habitual cruel and inhuman treatment and habitual drunkenness, or, alternatively,

irreconcilable differences.  The Chancery Court of Wayne County dismissed her complaint

after a short trial.  Renee appeals, asserting that the chancery court erred in (1) dismissing her

complaint in light of the overwhelming weight of the evidence proving her alleged grounds

for divorce, (2) failing to make findings of fact and conclusions of law, and (3) excluding the

proffered testimony of Dr. Bharat Patel.  We affirm.

FACTS

¶2.    James and Renee married on August 27, 1998.  The couple raised Renee's two

children. At the time that Renee filed her complaint, the couple had recently adopted Renee's grandchild and were raising him.

¶3.     For fourteen years prior to trial, James worked as an oil-rig manager, which required him to work away from home for two weeks, then stay home for two weeks. Both Renee and James testified that he drank alcohol when he was home. When asked at trial if James "got drunk every[ ]day," Renee replied, "I guess with him there's stages of drunkenness . . . . He can drink a lot of alcohol[,] and some people wouldn't even think he's drunk." Renee also testified that James's behavior would change depending on how much he had had to drink. Renee stated that she "begged [James] to quit drinking over twenty years," and that while he might sometimes quit for months, he would always begin drinking again. James testified that Renee knew before they married that he drank alcohol—as the couple had dated for several years and lived together prior to marrying—and she married him anyway. Renee responded that she and James had discussed his drinking prior to their marriage, and that she had relied on James's assertions that he hoped to stop drinking once he settled down and had a family.

¶4.     Both Renee and James testified that they had separated on multiple occasions throughout the marriage. However, until their most recent separation, they had always reconciled, even after James was arrested and pleaded guilty to domestic violence in August 2006. At trial, Renee and James presented differing versions of the events leading to James's arrest: Renee asserted that James punched her in the face and beat her until the police came, while James testified that he merely grabbed Renee. Renee stated that, in addition to this

2

particular incident, James would often push or grab her by her arms or clothes. Renee also testified that James was emotionally abusive, in that he would scream at her, call her names, and make derogatory comments.

¶5. Renee filed her complaint for divorce on June 25, 2015, on the grounds previously stated. James initially filed a counterclaim, in which he asserted his own grounds for divorce; however, he later withdrew his counterclaim. Trial was conducted before the chancery court, during which James, Renee, and six other witnesses—Patsy Harper (Renee's mother), Benton Harper (Renee's stepfather), Brittany Welborn (Renee's daughter), and three of Renee's friends: Michelle Collins, Felicia Sellers, and Sandy Toombs—testified.

¶6. Patsy and Benton both testified that they had lived with James and Renee for about a year in 2014; however, they presented differing accounts of James and Renee's marriage: Patsy testified that, while she lived at the home, she observed that James was easily angered and that he was drunk once or twice in the two-week spans that he lived at home; however, Benton testified that he did not see anything unusual with James and Renee's marriage. Brittany, who lived in a mobile home on James and Renee's property, corroborated Patsy's statement that James was easily angered, testifying that he "would be normal for a minute and then you never knew when . . . he was gonna wig out on you. . . . [Y]ou may be having a normal conversation and the next thing you know, he - - one of us has said something wrong or it was taken the wrong way." Brittany further testified that she had observed James drink and get drunk a "[c]ouple nights a week." Brittany also testified that while she had

3

never personally observed physical violence between James and Renee, on the date of the August 2006 domestic-violence incident, she had personally observed that "the whole left side of [Renee's] face was bruised."

¶7.    Michelle lived with Renee and James from about 2003 to 2005; she testified that, at the time of trial, she lived next door to Renee and saw her nearly every day. However, she had not been inside Renee and James's home on a regular basis "in the last few years." While she had never seen James hit Renee, she had "seen him push her and be in her face, [and] cuss her in front of several people." Michelle also testified that she had seen Renee with a "horrific black eye."[1] Michelle maintained that James drank "[a]s much as he could hold" every day, and that he would begin drinking at least by lunch. Michelle testified that she had seen him leave the house and come home drunk "[m]any times." Felicia and Sandy testified that Renee and James argued, and that Renee had expressed concern about James's drinking. Felicia further testified that Renee had told her about James inflicting physical violence on her, but that she had never witnessed Renee with any injuries. Several witnesses—including Patsy, Michelle, and Renee—testified that James's conduct had negatively impacted Renee's mental health.

¶8.    At the end of the trial, Renee's counsel sought to introduce the deposition of Dr.

---

[1] Renee presumably obtained this injury on the date of the domestic violence incident when James was arrested, as Michelle testified that she witnessed Renee's black eye "in '06," and she subsequently testified as to her son's description of the incident wherein James was arrested, which her son had witnessed.

4

Patel.[2] James objected on the basis that Renee had only given notice of the deposition to opposing counsel on January 25, 2016, when the deposition itself was to take place on January 26, 2016. Due to such short notice, James's counsel had been unable to attend the deposition. The chancellor denied Renee's request on the bases that notice was untimely and that opposing counsel had not been present for the deposition.

¶9. After the chancellor denied Renee's attempt to introduce Dr. Patel's deposition, James's counsel moved to dismiss Renee's complaint under Rule 41(b) of the Mississippi Rules of Civil Procedure. The chancellor granted the dismissal on the basis that Renee only presented one incident of domestic violence occurring over ten years prior to the filing of her complaint, which was insufficient to constitute habitual cruel and inhuman treatment. Further, the chancellor ruled that Renee had only presented evidence that James habitually drank, not that he was habitually drunk, which was insufficient to constitute habitual drunkenness.[3] Renee filed this timely appeal.

DISCUSSION

¶10. "In domestic-relation cases, our review is limited to whether the chancery court's findings were manifestly wrong or clearly erroneous, or [whether] the court applied the

---

[2] In her brief, Renee asserts that she has received treatment from Dr. Patel since 2004, although she does not explain what type of medicine he practices. Renee maintains only that Dr. Patel's proffer reveals that she was suffering from "debilitating migraines . . . , fibromyalgia, chronic sinusitis, lumbar spondylosis, . . . spondylolisthesis," and depression.

[3] The chancellor additionally awarded James and Renee joint legal and physical custody of their minor child, and ordered James to pay Renee $1,063.60 per month as child support.

5

wrong legal standard." *Lomax v. Lomax*, 172 So. 3d 1258, 1260 (¶5) (Miss. Ct. App. 2015) (citation and internal quotation marks omitted). "If there is substantial evidence in the record to support the chancery court's findings of fact, we will not reverse its decision on appeal." *Id*. (citation omitted). However, "[w]hen reviewing a chancellor's interpretation and application of the law, our standard of review is de novo." *Smith v. Smith*, 90 So. 3d 1259, 1262 (¶8) (Miss. Ct. App. 2011) (citation omitted).

I.    *Whether the chancellor erred in dismissing Renee's complaint*

¶11.    Rule 41(b) states in pertinent part:

> After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court may then render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence.

The Mississippi Supreme Court has expounded upon this rule, providing the following:

> The standard of review applicable on [a] motion to dismiss under Rule 41(b) is different [than] that applicable to a motion for a directed verdict. In considering a motion to dismiss, the judge should consider the evidence fairly, as distinguished from in the light most favorable to the plaintiff, and the judge should dismiss the case if it would find for the defendant. The court must deny a motion to dismiss only if the judge would be obliged to find for the plaintiff if the plaintiff's evidence were all the evidence offered in the case. [An appellate court] applies the substantial evidence/manifest error standards to an appeal of a grant or denial of a motion to dismiss pursuant to [Rule] 41(b).

*Stewart v. Merchs. Nat'l Bank*, 700 So. 2d 255, 258-59 (Miss. 1997) (internal citations and quotations omitted and emphasis removed from original).

¶12.    Here, Renee asserts that the chancellor erred in dismissing her complaint because she

presented overwhelming evidence in favor of both habitual cruel and inhuman treatment and habitual drunkenness.

### A. Habitual Cruel and Inhuman Treatment

¶13. "A chancellor's determination that a spouse's conduct rose to the level of habitual cruel and inhuman treatment is a determination of law, which we review de novo." *Smith*, 90 So. 3d at 1262 (¶8) (citation omitted). To obtain a divorce on the grounds of habitual cruel and inhuman treatment, the offended spouse must show by a preponderance of the evidence that the offending spouse's behavior either:

> (1) endanger[s] life, limb, or health, or create[s] a reasonable apprehension of such danger, rendering the relationship unsafe for the party seeking relief, or
>
> (2) [is] so unnatural and infamous as to make the marriage revolting to the non-offending spouse and render it impossible for that spouse to discharge the duties of marriage, thus destroying the basis for its continuance.

*Horn v. Horn*, 909 So. 2d 1151, 1155 (¶7) (Miss. Ct. App. 2005) (citations omitted). The offending spouse's conduct must exceed "unkindness or rudeness or mere incompatibility or want of affection" and "must be shown to have been systematic and continuous." *Id*. (citations omitted). Further, the offended spouse must show a causal connection between the offending spouse's conduct and the impact on the offended spouse. *Smith*, 90 So. 3d at 1263 (¶11). Such an inquiry is subjective, and "[t]he focus is on the effect the conduct has on the particular spouse, not its effect on an ordinary, reasonable person." *Id*. (citation omitted).

¶14. "Although in cases of violence a single incident may be sufficient for a divorce, generally the plaintiff must show a pattern of conduct." *Id*. at (¶13) (citation omitted). As

7

the chancellor noted, Renee only presented one instance of domestic violence at trial. While egregious, this incident occurred over ten years prior to the filing of Renee's complaint and was not the cause of the separation of the parties. The record reflects that Renee allowed James back into the home after he was released from jail. Further, the witnesses that Renee offered gave no testimony to suggest that this singular incident of domestic violence was the ultimate cause of the parties' separation. No witness testified as to any other incident where he or she had actually witnessed James inflict physical violence upon Renee, beyond Michelle's testimony that she had seen James "push" Renee before. However, Michelle did not specify whether she witnessed this when she lived with James and Renee in the early 2000s, or more recently. Without more evidence to suggest that the August 2006 incident was the direct cause of Renee and James's separation, or that James exhibited a pattern of violent conduct, the evidence provided by Renee was insufficient to meet the standard required by our caselaw for a divorce on the basis of habitual cruel and inhuman treatment. Accordingly, we find that the chancellor did not err in dismissing Renee's complaint on this ground.

### B.     Habitual Drunkenness

¶15.    "A court may grant a divorce on the ground of habitual drunkenness if the plaintiff proves that: (1) the defendant frequently abused alcohol; (2) the alcohol abuse negatively affected the marriage; and (3) the alcohol abuse continued at the time of the trial." *Lee v. Lee*, 154 So. 3d 904, 906 (¶7) (Miss. Ct. App. 2014) (citation omitted).

¶16.    Renee cites two cases in her brief in support of her assertion that James's conduct rose to the level of habitual drunkenness. In *Sproles v. Sproles*, 782 So. 2d 742, 744-45 (¶¶4, 7) (Miss. 2001), the Mississippi Supreme Court affirmed a chancellor's finding that the wife was entitled to a divorce on the grounds of habitual cruel and inhuman treatment and habitual drunkenness where the husband "regularly drank a case of beer at night," which resulted in him becoming abusive toward his wife, to the extent that "he pointed a firearm at her and threatened to kill her if she tried to leave." He also, "when intoxicated, was critical of [the wife's] housecleaning, eating habits, and would make accusations of her infidelity, even to the extent of pulling her pants down." *Id*. at 745 (¶7). Ultimately, the intoxicated husband's actions made the wife feel "less than human, degraded, and depressed." *Id*.

¶17.    Renee also cites *Lee*, 154 So. 3d at 907 (¶13), in which this Court affirmed the chancellor's grant of a divorce on the basis of habitual drunkenness due to "[the husband's] alcohol consumption, combined with the negative impact it had on the family, and his continued drinking at the time of trial." The wife testified that her husband "drank five to six beers per day," and that his drinking led to cruel behavior, such as urinating on her leg while she was asleep, locking her outside the house, and forcing her to crawl through a back door. *Id*. at 906 (¶9).

¶18.    While Renee presented multiple witnesses at trial who testified that James drank regularly—with James even conceding his regular alcohol use at trial—we decline to hold that the chancellor abused his discretion in dismissing Renee's complaint for a divorce based

9

upon these grounds. The two cases that Renee presented to this Court are distinguishable from the matter at hand. In both of those cases, each wife testified that her husband committed deplorable acts, from pointing a gun at her to urinating on her leg. While we in no way condone the treatment of Renee that led to James's arrest for domestic violence, or his drinking, it was within the chancellor's discretion to find that his actions do not rise to the level of conduct that this Court and the Mississippi Supreme Court have required for a divorce to be granted on the basis of habitual drunkenness. As such, the chancellor did not err in finding that Renee failed to meet her burden of proof on this ground, and we cannot say that the chancellor manifestly erred in dismissing Renee's complaint.

  II.  *Whether the chancellor erred in failing to make findings of fact and conclusions of law*

¶19. Rule 52(a) of the Mississippi Rules of Civil Procedure provides:

> In all actions tried upon the facts without a jury the court may, and shall upon the request of any party to the suit or when required by these rules, find the facts specially and state separately its conclusions of law thereon and judgment shall be entered accordingly.

Renee cites our supreme court's decision in *Tricon Metal & Services, Inc. v. Topp*, 516 So. 2d 236, 239 (Miss. 1987), in which the court held that "in cases of any complexity, tried upon the facts without a jury, the [c]ourt generally should find the facts specially and state its conclusions of law thereon." In other words, where "a case is hotly contested and the facts greatly in dispute and where there is any complexity involved therein, failure to make findings of ultimate fact and conclusions of law will generally be regarded as an abuse of

discretion." *Id*.

¶20. Renee did not request the chancellor to make findings of fact and conclusions of law. However, she argues on appeal that the chancellor abused his discretion in failing to do so because the case "was hotly contested and the facts were greatly in dispute." James maintains that Renee waived her right to request that the chancery court enter findings of fact and conclusions of law, and that the chancery court properly exercised its discretion in rendering a bench opinion only.

¶21. We find that the chancellor did not err in failing to make findings of fact or conclusions of law. First, Renee did not request the chancellor to do so. Second, the facts were neither hotly contested, greatly in dispute, nor complex so as to require the chancellor to have done so without a request. As such, we find this claim without merit.

    *III.     Whether the chancellor erred in excluding Dr. Patel's deposition*

¶22. Rule 32(a) of the Mississippi Rules of Civil Procedure provides that deposition testimony may be used when a witness is not available to testify. "The admission of deposition testimony is within the sound discretion of the trial court." *Robinson v. Lee*, 821 So. 2d 129, 133 (¶16) (Miss. Ct. App. 2000) (citation omitted). "Where the exercise of the court's discretion is not supported by the evidence, this Court is obligated to find an abuse of discretion." *Id*. at 134 (¶19) (citation omitted).

¶23. Here, Renee argues that the chancery court erred in excluding the proffered deposition testimony of Dr. Patel. In contrast, James argues that the chancery court was justified in

doing so due to the late notice he was given that Dr. Patel would be deposed. The document sought to be offered into evidence was hardly a deposition, as Renee claims. James's counsel was unable to attend the deposition due to such short notice—just one day's notice—and, therefore, did not participate in the questioning of Dr. Patel. As such, we find that Dr. Patel's testimony was more of a statement than a deposition, and the chancellor did not abuse his discretion in excluding it. For the reasons discussed, we affirm the judgment of the court, dismissing Renee's complaint for divorce.

¶24.    **AFFIRMED.**

**LEE, C.J., FAIR, GREENLEE AND WESTBROOKS, JJ., CONCUR. WILSON, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. GRIFFIS, P.J., BARNES AND CARLTON, JJ., DISSENT WITHOUT SEPARATE WRITTEN OPINION. TINDELL, J., NOT PARTICIPATING.**