# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-CA-00372-COA

**TONI MILES CULUMBER**                                                   **APPELLANT**

**v.**

**ROBERT L. CULUMBER**                                                    **APPELLEE**

DATE OF JUDGMENT:           07/29/2016
TRIAL JUDGE:                HON. SANFORD R. STECKLER
COURT FROM WHICH APPEALED:  HARRISON COUNTY CHANCERY COURT,
                            SECOND JUDICIAL DISTRICT
ATTORNEY FOR APPELLANT:     JOHN R. REEVES
ATTORNEY FOR APPELLEE:      ALBEN NORRIS HOPKINS JR.
NATURE OF THE CASE:         CIVIL - DOMESTIC RELATIONS
DISPOSITION:                AFFIRMED - 12/04/2018
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**LEE, C.J., FOR THE COURT:**

¶1.     In this appeal, we must determine whether the Harrison County Chancery Court, Second Judicial District, erred when it granted Robert Culumber a divorce from Toni Culumber on the grounds of habitual cruel and inhuman treatment and habitual drunkenness and declined to award Toni rehabilitative alimony. Finding the chancellor's decision was supported with substantial credible evidence, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.     Robert Culumber and Toni Miles Culumber were married on May 22, 2013, in Las Vegas, Nevada. Robert was nineteen years older than Toni and had one child from a previous relationship, but the parties had no children together. Sometime in July 2014, the

parties separated after only thirteen months of marriage. On August 29, 2014, Robert filed for divorce on the grounds of habitual cruel and inhuman treatment and habitual drunkenness or, in the alternative, irreconcilable differences. Toni filed her answer and counterclaimed for a divorce on grounds of habitual cruel and inhuman treatment, habitual drunkenness, habitual and excessive drug use, adultery, or in the alternative, irreconcilable differences. Following a trial, spanning dates from July 2015 to July 2016, the chancellor granted Robert a divorce from Toni on the grounds of habitual cruel and inhuman treatment and habitual drunkenness.

¶3.     At trial, Robert testified that from the very beginning of the marriage, Toni had trust issues that led to "psychotic, manic, violent outbursts" throughout the marriage. He also testified that Toni was physically combative and struck him throughout the marriage, and that she would lunge at him and swing at him "constantly." According to Robert, when he would attempt to leave the home during these outbursts, Toni would threaten him. Robert testified that he feared for his safety and left the marital home fifty to sixty times during the marriage due to this fear. In addition to being afraid to stay in the home while Toni was there, Robert also stated that he would leave in an effort to avoid confrontation and avoid having the police called to the home. He also stated that he left so that he could get a restful night's sleep because he was working two jobs and that Toni did not respect his time, his job, or his clients. On these occasions when he left the home, Robert stayed with friends, neighbors, and his mother.

¶4.     Robert testified that he lived in the marital home for twenty-one years prior to his

2

marriage to Toni and had never received neighbor complaints or police visits. But, after just two months of marriage, the police were called to the residence due to neighbor reports of arguing between the parties. During the short marriage, the police were called at least four times to the marital home. Robert testified that during Toni's violent outbursts, she caused property damage to the home, with incidents where she cracked the granite kitchen-counter tops around the kitchen sink, destroyed custom cabinets that were installed prior to the marriage, smashed vases, knocked pictures out of frames and off the wall, knocked holes in the sheetrock of the wall, and kicked in doors. He also testified that one evening he came home from fishing and found all of their wedding gifts and picture frames "smashed out in the street" and that a neighbor helped him clean it up. Robert stated that the very next night, he came home and all of his suits had been thrown out in the front yard, and furniture from the house had been moved outside to the driveway. On a separate occasion, a neighbor had alerted him that sheets and blankets had been thrown on the house, covering windows and doors. In one particular incident, Robert came home, and as soon as he walked in the door, Toni threw hot, melted cheese in his face and on his body. She then slammed her head into the wall and called police alleging Robert had struck her. The police came and arrested Robert, though he was ultimately released, and no charges were pressed.

¶5.    Robert also testified that Toni drank excessively throughout the marriage. He stated that she drank every night and was drunk five out of seven nights per week. He also said that she was prescribed pain pills which she took excessively and drank excessively in combination with the pills. Robert testified that many of the couple's fights and Toni's

3

violent outbursts were precipitated by her drinking. Robert admitted at trial to occasional, recreational marijuana use.

¶6. Robert called Michael Newman to testify as a corroborating witness. Newman stated that he and Robert met in seventh grade and had known each other for forty-seven years. He and Robert had also been neighbors for the past twenty-one years. Newman testified that just three or four days after Robert and Toni married in Las Vegas, Robert was back in Biloxi and called Newman, saying that he and Toni were not getting along and that he did not feel safe staying in the marital home. Robert asked if he could stay with Newman, and Newman agreed. Newman testified that Robert stayed with him three nights the first time, five nights the second time, and then one to two nights on and off throughout the marriage. He also stated he was aware that Robert stayed with others, including Robert's mother, a friend named Ronnie Ellis, and even at a hotel room once or twice.

¶7. During his testimony about the first night Robert stayed with him, Newman described Robert as being in "extreme distress" and stated that he was "afraid to leave [Robert] alone." He stated that Robert was tremendously distraught about the situation with Toni and that he was "seriously concerned that [Robert] was going to have a heart attack or a stroke." Newman also expressed he "was actually concerned that [Toni] might kill [Robert]." When Toni cross-examined Newman about an incident where Robert had to leave the marital home due to Toni's behavior and then later, once Toni had left, Robert changed the locks, Newman answered that he "didn't want [Toni] sneaking into the house while [Robert] was asleep and killing him. . . . That's exactly what I thought."

4

¶8.    When asked if he had ever been in the Culumber home during their marriage, Newman responded that he had and confirmed he had witnessed broken items and the home in disarray. He also described an incident where he noticed the Culumber house had "bedclothes, sheets draped all over the outdoor areas of the home, or any window or opening that might be observable from [Newman's] home." When Newman asked Robert about it, Robert speculated to him that Toni was afraid Newman, a private investigator, was surveilling or spying on Toni. Newman testified that he never spied or otherwise invaded Toni's privacy.

¶9.    Newman also testified about the incident where Toni threw hot cheese on Robert. Newman stated he received a call from Robert, first asking where Newman was and then asking if he would please come over. According to Newman, Robert explained to him on the phone that when Robert walked through the door that evening after work, Toni "assaulted him by throwing a pot of melted Velveeta cheese onto his body, his head and his chest." Robert told Newman that Toni "then ran her head into the wall in the house and was in the process, as [they] spoke, of dialing 911." Robert requested that Newman come over and "stand by"—which he did. When Newman arrived at the Culumber house, he observed Robert with cheese on his face, shirt, shorts, and leg. He also testified that it "appeared to have burned his face and his hand in one spot that [he] could see." On both direct and cross examination, Newman reiterated his concerns for Robert's safety and stated that Robert feared for his own safety because of Toni's behavior. He said he was personally aware of four occasions when the police came to the home due to calls about domestic disturbance.

He also stated that there had been meetings amongst the neighbors to discuss the domestic disturbances and the volatility of the situation.

¶10. Toni litigated pro se. Her counsel had withdrawn just prior to trial, and despite the numerous urgings of the chancellor that she hire an attorney, Toni continued pro se. During cross-examination, Toni admitted to violence in previous relationships. Specifically, she admitted to hitting one boyfriend, which resulted in her being arrested for domestic assault. She was again arrested for domestic assault in a different relationship where she admittedly bit her boyfriend repeatedly, broke the door frame, and damaged his apartment. In both these instances, Toni was arrested and the boyfriends were not. Toni also admitted that she had previously been arrested on cocaine charges, though the grand jury returned a no true bill. Toni admitted to having attended anger management. She testified that she had a history of anger issues and admitted that she, at the time of trial, still struggled with managing her anger. She also admitted that she experienced these anger episodes during the course of her marriage, often while drinking. She admitted to a family history of alcoholism.

¶11. Toni held active prescriptions for Adderall, for ADHD; Bupropion, for depression; and Hydrocodone, for neck pain. She admitted to drinking alcohol while taking the medications and testified that she was not advised against mixing the medication with alcohol. She admitted, however, that she would not be surprised if the warning labels advised against drinking alcohol with the medication because it could cause behavioral changes including aggression and hostility. Toni also admitted that on three of the four times that police were called to the home, she had been drinking. Toni's drug test, conducted

6

during trial, showed the presence of opiates, amphetamines, and alcohol.

¶12.  In its bench ruling, the court noted its responsibility to determine the credibility of the witnesses in evaluating the claims and grounds for divorce.  The court explicitly stated that it was "clear" that Toni was not credible.  The court went on to detail some of Toni's actions that it was "very concerned about" including that Toni secretly made recordings of court proceedings.  When the issue came up during trial, Toni flatly denied making any recordings and stated to the court that she had only made notes during the trial.  The court explained to her that she was not entitled to make any recordings and that it violated the court's rules.  In its bench opinion, the court later explained that it could have excused Toni for making the recordings because she was not an attorney and may not have been aware of the rules, but what was "inexcusable" is that she later perjured herself.  Toni stated she didn't know anything about the recordings or the making of any recordings, yet she submitted "transcripts" that she had prepared which the court found were "actual verbiage from the trial."  The court stated that what Toni alleged was the product of note taking was "absolutely impossible . . . even from a seasoned court reporter who can take shorthand by hand."

¶13.  Additionally, the court noted that Toni had issues and found fault with almost all parties involved with the trial including her withdrawn counsel, opposing counsel, the temporary court reporter, the court's staff attorney, and even the sitting judge.  The court also stated that the vast majority of what Toni provided to the court was "a total fiction and absolutely contrary and the opposite of what all of the evidence was produced from the witness stand and the documents in evidence."

7

¶14. The court also stated that early on in the case, through her attorney, Toni was "most interested in money from Mr. Culumber and was pushing to get as much money as possible from Mr. Culumber." The court noted that the offers Robert made to Toni during in-chamber, on-the-record settlement negotiations exceeded the bounds of what the court could award pursuant to statutory and case law guidelines. The court suggested to Toni's then counsel that Toni should take the offer, but Toni refused and later accused the court of prejudging the case for making such a recommendation. Noting that Robert was a certified public accountant and therefore at an advantage in terms of the ability to hide and structure money—an accusation Toni had made—the court indicated to Toni that it could order forensic accounting of Robert's finances, but she rejected the offer. She also put on no evidence that he had hidden, tampered with, or otherwise manipulated his financial assets and interests.

¶15. The court also noted that Toni denied receiving exhibits from Robert's counsel when she indeed had received them, stated to the court that she had properly subpoenaed people when she had not subpoenaed them, and stated that she paid their attendance fee—later admitting she had not paid the fees. The court stated that it "could go on with numerous other[] [things]," concluding "it's clear that [Toni] is not credible."

¶16. On the other hand, the court found that Robert was credible and also that he produced a credible, corroborating witness. As such, the trial court granted Robert a divorce from Toni on the grounds of cruel and inhuman treatment and habitual drunkenness, and the court declined to award Toni rehabilitative alimony.

¶17. Toni now appeals, arguing that the chancery court erred when it (1) granted Robert a divorce on the grounds of habitual cruel and inhuman treatment and habitual drunkenness and (2) denied her request for rehabilitative alimony.

## STANDARD OF REVIEW

¶18. "It is well settled that appellate courts are bound by a limited standard of review in domestic-relations matters." *White v. White*, 208 So. 3d 587, 592 (¶10) (Miss. Ct. App. 2016). "This Court will not disturb the chancellor's opinion when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied." *Farris v. Farris*, 202 So. 3d 223, 230 (¶26) (Miss. Ct. App. 2016). "In the case of a divorce decree, facts will be viewed in a light most favorable to the appellee." *White*, 208 So. 3d at 592 (¶10) (internal quotation marks omitted). "For questions of law, our standard of review is de novo." *Id*.

## DISCUSSION

### I.    Grounds for Divorce

¶19. The chancery court granted Robert a divorce on the grounds of habitual cruel and inhuman treatment and habitual drunkenness. Toni appeals, arguing there was not substantial credible evidence to support a divorce on either of these grounds.

### A.    Habitual Cruel and Inhuman Treatment

¶20. Habitual cruel and inhuman treatment is behavior that "(1) endangers life, limb, or health, or creates a reasonable apprehension of such danger, rendering the relationship unsafe for the party seeking relief, or (2) is so unnatural and infamous as to make the marriage

9

revolting to the non-offending spouse and render it impossible for that spouse to discharge the duties of marriage, thus destroying the basis for its continuance." *Baggett v. Baggett*, 246 So. 3d 887, 892 (¶13) (Miss. Ct. App. 2017) (quoting *Horn v. Horn*, 909 So. 2d 1151, 1155 (¶7) (Miss. Ct. App. 2005)). The party seeking the divorce on this ground must prove habitual cruel and inhuman treatment by a preponderance of the evidence. *Id*.

¶21. "The offending spouse's conduct must exceed 'unkindness or rudeness or mere incompatibility or want of affection' and 'must be shown to have been systematic and continuous.'" *Id*. (quoting *Horn*, 909 So. 2d at 1155 (¶7)). "Such conduct must be habitual, that is, done so often, or continued so long, that its recurrence may be reasonably expected whenever occasion or opportunity presents itself." *White*, 208 So. 3d at 593 (¶12). "[T]he offended spouse must show a causal connection between the offending spouse's conduct and the impact on the offended spouse." *Baggett*, 246 So. 3d at 892 (¶13). "Such an inquiry is subjective, and the focus is on the effect the conduct has on the particular spouse, not its effect on an ordinary, reasonable person." *Id*. (internal quotation mark omitted).

¶22. "The party alleging cruel and inhuman treatment typically must corroborate the testimony." *White*, 208 So. 3d at 593 (¶13). "[C]orroborating evidence need not be sufficient in itself to establish habitual cruelty, but rather need only provide enough supporting facts for a court to conclude the plaintiff's testimony is true." *Id*.

¶23. In the present case, there was testimony that Toni was not just unkind or rude or that she and Robert merely engaged in heated arguments, but that Toni was verbally and physically combative towards Robert constantly. She often exhibited what was described as

"violent outbursts" that were not, per the chancellor's findings, precipitated or warranted by Robert's behavior. During such outbursts, she caused physical destruction to the couple's home and also physically assaulted Robert on more than one occasion. Robert testified that this conduct, which was constant, caused him to be in fear for his life and safety and also caused him to leave the marital home fifty to sixty times in just over one year of marriage. Toni herself admitted she had anger issues and also admitted to a history of exhibiting violence in relationships. Robert's testimony was corroborated by Newman, with whom Robert had stayed on several occasions during Toni's combative outbursts. Newman corroborated that Robert was physically and emotionally distraught over Toni's behavior and was fearful for his safety. Newman stated that he was concerned that Robert may have a heart attack or stroke, and he even feared that Toni was going to kill Robert. Newman also corroborated the volatility of the relationship, noting the police had come several times to the Culumber home and that the neighbors had discussed the volatile situation. Newman also knew that Robert had stayed with others, besides himself, when Robert had to leave the marital home because of Toni's behavior. Corroborating one particular incident, Newman witnessed hot, melted cheese on Robert's face and body, which Toni had thrown on Robert as soon as he walked in the door from work. Newman testified that Robert appeared to have burns from this incident.

¶24. "Upon review, this Court is reminded that the chancellor is vested with the sole authority and responsibility to assess witness credibility as no jury is present." *White*, 208 So. 3d at 594 (¶16) (internal quotation mark omitted). "The chancellor alone hears the

11

testimony and sees the demeanor of the witnesses." *Id*. (internal quotation mark omitted). "This Court cannot, and will not, reweigh the evidence or reconsider the credibility of the witnesses." *Id*. (internal quotation mark omitted). As such, the chancellor here found that Robert had proved habitual cruel and inhuman treatment, and we find that there was substantial credible evidence to support his decision. Toni's behavior was systematic and continuous to such a degree that it created a reasonable apprehension of danger, forcing Robert to leave the home on numerous occasions—evidencing the subjective effect that is to be considered. Toni's behavior was constant such that "its recurrence may be reasonably expected whenever occasion or opportunity presents itself." And Newman "provide[d] enough supporting facts for a court to conclude [Robert's] testimony [wa]s true." *See Baggett*, 246 So. 3d at 892 (¶13). Accordingly, we do not find that the chancellor abused his discretion, was manifestly wrong, clearly erroneous, or applied an erroneous legal standard. We find that the chancellor's grant of the divorce on ground of habitual cruel and inhuman treatment was based on substantial credible evidence.

### B. Habitual Drunkenness

¶25. Toni also argues that there was no evidence to support a divorce on the ground of habitual drunkenness. Specifically, she states there was no medical testimony or medical evidence to show she had any issues with alcohol.

¶26. "A court may grant a divorce on the ground of habitual drunkenness if the plaintiff proves that: (1) the defendant frequently abused alcohol; (2) the alcohol abuse negatively affected the marriage; and (3) the alcohol abuse continued at the time of the trial." *Id*. at 893

12

(¶15) (quoting *Lee v. Lee*, 154 So. 3d 904, 906 (¶7) (Miss. Ct. App. 2014)).

¶27. Robert's testimony, which the chancellor found credible, stated that Toni drank every night, drank excessively, mixed alcohol with contraindicated prescriptions, and was drunk five out of seven nights per week. Toni herself admitted that she had anger issues when she drank, that she was drinking on three of the four occasions police were called to the home, and that she drank while taking her prescription medications. Specific examples of Toni's drinking included Robert's testimony that on the last night of their honeymoon, security was called on them because Toni was passed out on the floor. Additionally, prior to trial proceedings, Robert and a notary went to Toni to have a property-settlement agreement signed, but when they arrived, Toni was passed out on the floor drunk. Drug testing during trial revealed alcohol in Toni's system along with the presence of her prescription drugs, which were contraindicated with alcohol use. As such, there was substantial credible evidence to support the chancellor's finding that Robert had proved Toni's habitual drunkenness. This issue is without merit.

## II. Rehabilitative Alimony

¶28. Finally, Toni argues that in the event that the divorce was properly granted, then the chancery court improperly denied Toni's request for rehabilitative alimony. Toni alleges that even though the marriage was short, she is entitled to rehabilitative alimony payments because Robert paid all the bills and expenses in the marriage and that she needs assistance to become self supporting after the marriage.

¶29. We first note that alimony is considered only if after equitable division, one party is

left with a deficit. *Carney v. Carney*, 201 So. 3d 432, 440 (¶28) (Miss. 2016). "The decision of whether to award alimony, and if so, what amount, is left to the chancellor's discretion." *Hearn v. Hearn*, 191 So. 3d 129, 132 (¶10) (Miss. Ct. App. 2016). When determining whether to award alimony, the chancellor is to consider the *Armstrong* factors:

> (1) the income and expenses of the parties; (2) the health and earning capacities of the parties; (3) the needs of each party; (4) the obligations and assets of each party; (5) the length of the marriage; (6) the presence or absence of minor children in the home, which may require that one or both of the parties either pay, or personally provide, child care; (7) the age of the parties; (8) the standard of living of the parties, both during the marriage and at the time of the support determination; (9) the tax consequences of the spousal support order; (10) fault or misconduct; (11) wasteful dissipation of assets by either party; or (12) any other factor deemed by the court to be "just and equitable" in connection with the setting of spousal support.

*Larson v. Larson*, 192 So. 3d 1137, 1142 (¶12) (Miss. Ct. App. 2016) (citing *Armstrong v. Armstrong*, 618 So. 2d 1278, 1280 (Miss. 1993)).

¶30. In regard to the type of alimony Toni argues she is entitled to, we note that rehabilitative alimony is "an equitable mechanism which allows a party needing assistance to become self-supporting without becoming destitute in the interim." *Serio v. Serio*, 203 So. 3d 24, 30 (¶17) (Miss. Ct. App. 2016) (quoting *Lauro v. Lauro*, 847 So. 2d 843, 849 (¶15) (Miss. 2003)). It is "awarded to parties who have put their career on hold while taking care of the marital home." *Id*. "Rehabilitative alimony allows the party to get back into the working world in order to become self-sufficient." *Id*.

¶31. The chancellor stated that there was no basis for alimony. Toni alleges that the chancellor placed too much emphasis on the length of the marriage and did not properly consider the other factors. The record indicates otherwise. As the chancellor noted, Toni

14

was not working at all when she came into the marriage. Additionally, she brought approximately $30,000 of debt into the marriage which Robert paid off in full. It is true, as the chancellor noted, that the marriage was very short—barely one year. The parties had no children. Per the chancellor's findings, Toni was "actually better off by virtue of the marriage in terms of her education, having her student loan paid off and other things to help her further her career, rather than lose it." Career wise, Toni was relatively young—being in her late thirties, while Robert was approaching retirement—being in his late fifties. In December 2013, Toni became employed, making around $38,000, and this employment continued at the time of trial. Robert paid all of the bills and expenses during the short-term marriage and assumed responsibility for all marital debt. Toni received payment for her equitable share of marital assets in the amount of $13,442.00. As we now affirm, the chancellor found Toni at fault in the marriage on grounds of habitual cruel and inhuman treatment and habitual drunkenness. We do not find that the chancellor abused his discretion in denying Toni an award of rehabilitative alimony. This issue is without merit.

## CONCLUSION

¶32. We affirm the decision of the chancery court to grant Robert a divorce from Toni on the grounds of habitual cruel and inhuman treatment and habitual drunkenness. We also affirm the chancery court's decision to deny Toni's request for rehabilitative alimony.

¶33. **AFFIRMED.**

**IRVING AND GRIFFIS, P.JJ., BARNES, CARLTON, FAIR, WILSON, GREENLEE AND WESTBROOKS, JJ., CONCUR. TINDELL, J., NOT PARTICIPATING.**