# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CA-00532-COA

TOMMY ANDERSON                                          APPELLANT

v.

CARRIE ANDERSON                                          APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 07/11/2018 |
| TRIAL JUDGE: | HON. C. MICHAEL MALSKI |
| COURT FROM WHICH APPEALED: | LEE COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | BRIAN LEE STARLING |
| ATTORNEY FOR APPELLEE: | JAK McGEE SMITH |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 03/31/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE CARLTON, P.J., TINDELL AND McDONALD, JJ.

### CARLTON, P.J., FOR THE COURT:

¶1.     Carrie Anderson was granted a divorce from her husband, Tommy (T.J.) Anderson, on the statutory grounds of adultery and habitual cruel and inhuman treatment. T.J. appealed the chancery court's determination of certain issues regarding real and personal property. Finding no error, we affirm.

### STATEMENT OF FACTS AND PROCEDURAL HISTORY

¶2.     T.J. and Carrie were married on January 12, 2008. The parties have two minor children, Robert[1] (born in 2011) and Jane (born in 2014). On October 2, 2015, Carrie filed for divorce in the Lee County Chancery Court on the ground of irreconcilable differences.

---

[1] Fictitious names are used for the minor children.

Carrie later filed two amended complaints for divorce on the statutory grounds of adultery and habitual cruel and inhuman treatment. T.J. filed answers to Carrie's first and second amended complaints for divorce. He did not file a counter-complaint seeking any relief.

¶3. The case was tried over a period of eight days, beginning in November 2016 with the last day of trial on November 9, 2017. On March 8, 2018, the chancery court entered a "Memorandum Opinion and Final Judgment" granting Carrie a divorce on the statutory grounds of adultery[2] and habitual cruel and inhuman treatment.[3]

¶4. In its opinion and final judgment, the chancery court addressed the numerous issues before it, including custody of the couple's two children, visitation, support, and related matters; property division; issues surrounding T.J.'s contempt, intentional misrepresentations to the court, and retroactive child support; attorney's fees; and the sale of the homestead.

¶5. T.J. appealed following the chancery court's final judgment with respect to three issues: (1) the chancery court's classification of fifty-nine acres deeded to T.J. and Carrie from Carrie's grandmother as non-marital property and award of it to Carrie; (2) the chancery court's determination on the division of furniture and appliances; and (3) the chancery court's determination that T.J. must reimburse his son's savings account in the amount of $14,000, plus interest that would have accumulated had the funds not been withdrawn. We now address the facts relating to these three issues.

---

[2] T.J. admitted at trial to having several sexual relationships during the marriage.

[3] We address the evidence relating to this statutory ground in connection with the facts relating to T.J.'s assertion that the chancery court erred in classifying fifty-nine acres from Carrie's grandmother as non-marital property and awarding it to Carrie.

### A.     Issues

### I.     The Fifty-Nine Acres of Land

¶6.     Carrie's grandmother, Clytee Hansberger, owned fifty-nine acres of unimproved real estate in Pontotoc County, Mississippi.  The record contains a September 2013 warranty deed from Mrs. Hansberger (through CH Farms LLC) to Carrie and T.J.  At trial, Carrie testified that the land was supposed to be put in her name and that the property had "been in the family a long time" and "would have most likely been given to [her] once [her] grandmother passed away."

¶7.     According to Carrie's testimony at trial, when Carrie and T.J. went to have the deed prepared by the family lawyer, Jimmy Bingham, she "was afraid that [T.J.] would be upset" if his name was not on the deed, so she had Bingham put his name on the deed.  When Carrie was asked why she did not change the deed so that the property was in her name, alone, Carrie testified that she was too afraid of T.J. to do so, as follows:

> T.J. was standing right next to me with Jimmy Bingham and I was scared of his reaction of what—I was scared of him.  I was afraid what he would do if I asked Jimmy to do the deed just in my name as it was intended when I went to his office.

¶8.     Regarding Carrie's fear of T.J., testimony at trial reflects that T.J. attacked Carrie,[4] punched numerous holes in the walls and doors in both their Tupelo and Senatobia homes,[5]

---

[4] Carrie testified that T.J. had physically assaulted her on several occasions.  One of Carrie's witnesses, Brittani Boatwright, testified that while she was an overnight guest of T.J. and Carrie, she witnessed T.J. grab Carrie, push her up against the fireplace, and hit and choke her.

[5] Carrie testified that T.J. would frequently lose his temper, go into a rage, and punch holes in the walls and doors of their house.  This testimony was corroborated by two other

3

killed at least two of their dogs,[6] and frequently threatened and verbally abused Carrie. As noted above, the chancery court granted Carrie a divorce on the statutory ground of habitual cruel and inhuman treatment (as well as on the ground of adultery).

¶9.     Neither Mrs. Hansberger nor Bingham testified at trial. The record reflects that the property was debt-free when it was deeded to Carrie and T.J., the parties made no financial contribution toward the property and its maintenance, and the parties did not use it. Carrie testified that the property was under lease to two gentlemen, which was set up through a trust with any maintenance being paid through the trust.

## II.     The Furniture and Appliances

¶10.    Carrie testified that her grandmother and other relatives had given her quite a bit of furniture over the years or that she had furniture that had been hers since college. She admitted that "everyone [in the family]" used the furniture. Carrie took some of this furniture from the marital home to her grandmother's home when she left T.J. Carrie testified that she returned a number of items to the marital home for T.J.'s use. At trial, Carrie introduced Exhibit No. 29 that showed what she took and what T.J. got from the division of the marital personal property.

¶11.    The record reflects that T.J. did not file a counter-complaint asking for an equitable

witnesses.

[6] As a side job during the marriage, T.J. would train his own dogs as hunting dogs for sale. Carrie testified that T.J. killed at least two of the dogs when T.J. would lose his temper or the dog did not appear to meet T.J.'s expectations. She also testified that T.J. hit the dogs with a bat with "enough force to break bones" and "put shock collars on [the dogs] and turn it up so high that their whole front body would raise and they would have . . . foam in their mouth and they would be terrified."

division of the personal property. At trial, T.J. made an objection that Carrie got valuable furniture and that the chancery court should have divided the furniture and appliances. T.J. did not submit a value for any of the furniture or submit a list of furniture and appliances that he wanted. T.J. did not deny that he got the furniture listed in Exhibit No. 29.

### III. Robert's Savings Account

¶12. In 2013, Carrie's grandmother, Mrs. Hansberger, gave $14,000 to T.J. and Carrie's son, Robert, as a college fund. Robert was only two years old at the time that Mrs. Hansberger gave him this college fund. T.J. put this money into a savings account in T.J.'s and Robert's names.

¶13. During the marriage, T.J. withdrew sums of money on different occasions from Robert's college savings account until there was no money left in the account. T.J. testified at trial that Carrie was "generally aware" that he had withdrawn the money. Carrie testified that she was not aware that T.J. had taken this money until the parties separated and she found a passbook savings account, which showed that T.J. had removed all of the money. T.J. admitted at trial that he never put any of the money into the parties' joint account. He testified that he "paid bills with it" but was unable to specifically account for it.

### B. Additional Procedural History

¶14. The chancellor stated on the record at trial that T.J. was "among the most dishonest individuals that I have had on the stand" in his years as a judge. It was brought out at trial that T.J., for example, misrepresented his employment history, salary, and commissions to the chancery court. In its opinion and final judgment, the chancery court declined to

5

"catalogue the egregious examples of T.J.'s numerous lies," but the court did describe an incident where T.J. denied he had posted derogatory remarks about Carrie on social media. Later in the trial, when Carrie's lawyer arranged for a "police computer expert" to testify, T.J. confessed that he had in fact sent the posting and had lied to the court about it.

¶15.    As noted above, the chancery court entered its opinion and final judgment on March 8, 2018, granting Carrie a divorce on two statutory grounds: adultery and habitual cruel and inhuman treatment.  T.J. filed a "Motion from Relief from Order" on July 9, 2018, in which he primarily sought modification of his child support obligation, but he also requested in that motion that he "be credited to his judgment debt for half the value of the marital property removed from the marital home by [Carrie]."

¶16.    On July 11, 2018, the chancery court entered its order on T.J.'s motion, addressing certain child support calculations not at issue in this appeal.  As to T.J.'s request regarding a credit to his judgment debt for alleged marital property removed from the home, the order provided that "all other provisions of the Court's Memorandum Opinion and Final Judgment shall remain in full force and effect unless modified herein."  The July 11, 2018 order also provided that "[u]pon entry of this order, the court's Memorandum Opinion and Final Judgment of March 7, 2018, shall be considered a final judgment [for] all purposes."[7]  T.J. appealed.

## STANDARD OF REVIEW

¶17.    As the Mississippi Supreme Court recently reiterated in *Williams v. Williams*, 264 So.

---

[7] To avoid repetition, the portions of the chancery court's opinion and final judgment relating to the issues on appeal will be set forth in the discussion portion of this opinion.

3d 722, 725 (¶5) (Miss. 2019):

> This Court will not disturb a chancellor's judgment when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied. Under this standard of review, our purpose is to determine whether the chancellor's ruling was supported by credible evidence, not whether we agree with that ruling. However, we review the chancellor's interpretation and application of the law de novo.

(Citations and quotation marks omitted).

## DISCUSSION

### I. The Fifty-Nine Acres of Land

¶18. The chancery court found that the fifty-nine acres from Carrie's grandmother jointly titled in Carrie's and T.J.'s names was Carrie's separate, non-marital property, as follows:

> While some coercion may have been placed on Carrie to have T.J.'s name place on the deed [to the fifty-nine acres], even if there had been no coercion, the Court would still find the 59 acres to be Carrie's separate, non-marital property. The property came from Carrie's grandmother debt free. The parties never improved the property or put any money into the property.

The chancery court recognized that "[i]nter vivos gifts and inheritances are considered non-marital property unless they have been commingled." *McDonald v. McDonald*, 115 So. 3d 881, 885-86 (¶12) (Miss. Ct. App. 2013). The chancery court found that "[t]he fact that the 59 acres was jointly titled [in this case] did not make it a marital asset." *Id.* at 886 (¶¶12-14) (finding property purchased with funds inherited by a husband was the husband's separate property despite the property being jointly titled in both the husband and the wife); *see also Marter v. Marter*, 95 So. 3d 733, 737-38 (¶¶11-16) (Miss. Ct. App. 2012) (finding that property inherited by a wife prior to marriage and later jointly titled remained the wife's separate property); *Delk v. Delk*, 41 So. 3d 738, 741-42 (¶17) (Miss. Ct. App. 2010)

7

(recognizing that condominium property separately owned by a wife prior to marriage but later jointly titled did not become marital property until the couple began using the property as their marital home, and thus the husband was not entitled to a full half of the proceeds from the condominium). The chancery court expressly noted that "[t]he parties never lived on or improved the property. There was absolutely no commingling with marital property nor was the property utilized for domestic purposes." Continuing, the chancery court found that the fifty-nine acres did "not los[e] its status as nonmarital property," and ordered that T.J. deed his interest in the tract of land to Carrie.

¶19. T.J. asserts that the chancery court committed manifest error in this determination because the property at issue in this case was never Carrie's separate property in the first place, and thus the cases the chancery court relied upon in making its determination, *McDonald*, *Marter*, and *Delk*, are distinguishable. T.J. argues that in contrast to the circumstances in these cases, Carrie did not inherit the property, it was not purchased with inherited money, and was it not property Carrie owned prior to the marriage and later jointly titled. Rather, the property was acquired during the marriage and titled directly from Mrs. Hansberger to both T.J. and Carrie as an inter vivos gift; therefore, according to T.J., it is marital property, and he is entitled to an equitable division of that property.

¶20. Carrie, on the other hand, asserts that the evidence supports the chancery court's determination that the fifty-nine acres from her grandmother is her separate property and that under the cases relied upon by the chancery court, the mere fact that the property is jointly titled in both her and T.J.'s names does not, standing alone, convert the property to marital property subject to equitable distribution.

8

¶21.   In addressing this issue, we acknowledge that "[a]ssets acquired or accumulated during the course of a marriage are subject to equitable division unless it can be shown by proof that such assets are attributable to one of the parties' separate estates prior to the marriage or outside the marriage." *Hemsley v. Hemsley*, 639 So. 2d 909, 914 (Miss. 1994); *see generally* Deborah H. Bell, *Bell on Mississippi Family Law* § 6.03[1][a], at 139 (2d ed. 2011) ("Because of the presumption in favor of marital property, a spouse seeking separate classification bears the burden of proof."). Although, as T.J. asserts, the record does contain the 2013 warranty deed from Mrs. Hansberger to both T.J. and Carrie obtained by them during their marriage, we find that the record also contains substantial, credible evidence supporting the chancery court's determination that this property is attributable to Carrie's separate estate.

¶22.   In particular, although neither Mrs. Hansberger nor the attorney who prepared the deed testified at trial, Carrie testified that it was her grandmother's intent that she (Carrie) have the property.[8] Moreover, there was ample evidence presented at trial that Carrie legitimately feared for her safety and welfare if she did not have the land jointly titled, and thus she was essentially coerced into doing so.[9] *Cf. Estate of Langston v. Williams*, 57 So.

---

[8] As detailed in the statement of facts, Carrie testified that the land was supposed to be put in her name and that the property had "been in the family a long time" and "would have most likely been given to [her] once [her] grandmother passed away."

[9] As detailed in the statement of facts, Carrie testified that she was too afraid of T.J. to have title placed in her name alone. Regarding this fear, the record reflects that T.J. had attacked Carrie, punched numerous holes in the walls and doors in both their Tupelo and Senatobia homes, killed several of their dogs, and frequently threatened and verbally abused Carrie. As noted, the chancery court granted Carrie a divorce on the statutory ground of habitual cruel and inhuman treatment.

3d 618, 620-21 (¶10) (Miss. 2011) (describing the analogous concept of undue influence in the will context as using "undue methods for the purpose of overcoming the free and unrestrained will of the testator so as to control his acts and to prevent him from being a free agent"); *Bailey v. Estate of Kemp*, 955 So. 2d 777, 783 (¶23) (Miss. 2007) (discussing the analogous concept of duress as requiring "(1) that the dominant party threatened to do something which he had no legal right to do; and (2) that the wrongful threat overrode the volition of the victim and caused him to enter an agreement against his free will").

¶23.    In short, there is substantial, credible evidence that the property was intended to be Carrie's property and that her fear of T.J. prevented her from having it titled in her name. The chancery court therefore was correct in relying on *McDonald*, 115 So. 3d at 885-86 (¶¶12-14), in determining that "[t]he fact that the 59 acres was jointly titled [in this case] did not make it a marital asset." *See also Marter*, 95 So. 3d at 737-38 (¶¶11-16); *Delk*, 41 So. 3d at 741-42 (¶17).  The record reflects that the property was debt-free, the parties made no financial contribution toward the property or its maintenance during the marriage, and the parties did not use it.  We find no manifest error in the chancery court's determination on this issue, and we therefore find that T.J.'s first assignment of error is without merit.

## II.    The Furniture and Appliances

¶24.    T.J. asserts that the chancery court erred because it did not address the allocation of certain appliances and furniture that had been in the couple's home.  T.J. acknowledges that Carrie testified at trial that the personal property she took from the home when she left was given to her, alone, or consisted of items she had before she was married.  T.J. asserts, however, that Carrie also admitted at trial that these items were used by the family.  For this

reason, T.J. asserts that even if these items were separate property at one time, they subsequently were commingled and became marital property subject to equitable distribution. *See Parsons v. Parsons*, 741 So. 2d 302, 308 (¶28) (Miss. Ct. App. 1999) ("[W]hen an individual commingles non-marital assets with joint marital assets, the non-marital assets are converted into marital assets, subject to an equitable distribution unless subject to an agreement to the contrary." (emphasis omitted) (quoting *Johnson v. Johnson*, 650 So. 2d 1281, 1286 (Miss.1994)).

¶25.    Contrary to T.J.'s assertion that the chancery court did not address the allocation of the furniture and appliances, our review of the chancery court's opinion and final judgment shows that the court did address the division of the couple's personal property, as follows: "The parties shall have the use, possession, and ownership of the various items of personal property in their respective possession, except that Carrie shall return to T.J. any and all firearms in her possession."

¶26.    The record reflects that a list of household items prepared by Carrie was admitted at trial (Exhibit No. 29) that showed what she took when she left and what T.J. got from the division of the marital personal property.  T.J. did not deny that he got the furniture listed on Exhibit No. 29.  The record reflects that T.J. objected at trial, claiming that Carrie took valuable furniture and that the chancery court should divide the furniture and appliances. Although the record reflects that T.J. did not file a counter-claim requesting an equitable division of this personal property, his "Motion from Relief from Order" filed on July 9, 2018, requests that he "be credited to his judgment debt for half the value of the marital property removed from the marital home by [Carrie]."  There is nothing in the record from T.J.,

11

however, listing or providing a valuation of the furniture and appliances he wanted.

¶27. Under these circumstances, we find no abuse of discretion in the chancery court's allocation of this personal property. In this Court's decision in *Kimble v. Kimble*, 282 So. 3d 453 (Miss. Ct. App. 2019), we reiterated the principles applicable here:

> The foundational step to make an equitable distribution of marital assets is to determine the value of those assets based on competent proof. *It is incumbent upon the parties, and not the chancellor, to prepare evidence touching on matters pertinent to the issues to be tried. When a party fails to provide accurate information, or cooperate in the valuation of assets, the chancellor is entitled to proceed on the best information available.*

*Id.* at 456 (¶8) (emphasis added) (citations and quotation marks omitted).

¶28. The only evidence the chancery court had relating to the particular personal property at issue was the list (Exhibit No. 29) Carrie submitted. Under *Kimble*, it was T.J.'s responsibility to provide any additional information. Even when the chancellor asked T.J. if he had such information, T.J. did not submit a list or valuation of the personal property that he wanted. We find no abuse of discretion in the chancery court's division of this personal property because the court was "entitled to proceed on the best information available." *Id.* We therefore find no merit in this assignment of error.

### III. Robert's Savings Account

¶29. On the issue regarding the depletion of Robert's savings account, the chancery court found as follows:

> During their marriage Carrie's grandmother gave Carrie, T.J., and [Robert] $14,000 to put into a savings account for [Robert's] college education. T.J. placed this money in his name and in the name of the child. T.J. withdrew the money from this account. He claims that Carrie knew of the withdrawal. While the Court does not believe that Carrie knew that T.J. was withdrawing his son's money, it would be of small consequence. Carrie knowing would not

12

be justification for the withdrawal. T.J. withdrew and used his son's money. T.J. will be responsible for replacing any funds he withdrew from his son's account in the approximate amount of $14,000 together with any interest those withdrawals would have generated.

¶30. T.J. asserts that the chancery court committed manifest error when it ordered that T.J. be fully responsible for replacing the $14,000 removed from Robert's savings account, in addition to any lost interest attributable to the missing funds. Citing *McLaurin v. McLaurin*, 853 So. 2d 1279, 1286 (¶24) (Miss. Ct. App. 2003), T.J. argues that the money taken from that account was used to pay marital debts, and thus Carrie "should be equally responsible for replacing the money from the account."

¶31. We find no merit in T.J.'s assertions. As noted above, when Robert was two years old, Carrie's grandmother gave Robert $14,000 as a college fund, and T.J. put this money into a savings account in T.J.'s and Robert's names. The record reflects that T.J. withdrew sums of money on different occasions from this account until there was no money left in the account. At trial, T.J. testified that Carrie was "generally aware" that he had withdrawn the money. Carrie, however, testified that she did not know T.J. had taken this money until the parties separated and she found the passbook savings account showing that the money was missing. T.J. admitted at trial that he did not put the money in the couple's joint account. He testified that he "paid bills with it," but he could not specifically account for it.

¶32. We find relevant in this analysis that the record reflects a number of incidents reflecting T.J.'s lack of candor with the chancery court. "[T]he chancellor is vested with the sole authority and responsibility to assess witness credibility as no jury is present. The chancellor alone hears the testimony and sees the demeanor of the witnesses." *Culumber v.*

13

*Culumber*, 261 So. 3d 1142, 1150 (¶24) (Miss. Ct. App. 2018) (citations and internal quotation marks omitted). In this case, the chancellor stated on the record that T.J. was "among the most dishonest individuals that [he had] had on the stand" in the chancellor's nearly thirty years as a judge. Particular incidents at trial included T.J. substantially misstating his employment history and earnings and T.J. denying that he posted messages on social media berating Carrie and calling her inappropriate names. As described in the chancery court's opinion and final judgment,

> In Exhibit 43 Carrie was berated and called vile names. T.J. swore that he knew absolutely nothing about this posting. Several months later, after Carrie's attorney had arranged for a police computer expert to testify, T.J. confessed that he had in fact sent the posting and had lied to the Court about it.

¶33. In light of these circumstances and our limited standard of review, we find that the chancery court's order that T.J. replace the funds withdrawn from Robert's account, plus interest that would have been generated on those withdrawals, was based on substantial, credible evidence. We therefore find that T.J.'s assignment of error on this issue is without merit.

¶34. **AFFIRMED.**

**BARNES, C.J., J. WILSON, P.J., GREENLEE, WESTBROOKS, TINDELL, McDONALD, LAWRENCE, McCARTY AND C. WILSON, JJ., CONCUR.**

14