# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-CA-00847-COA

**NANCY SHANNON**                                                                    **APPELLANT**

**v.**

**LARON SHANNON**                                                                    **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 07/15/2020 |
| TRIAL JUDGE: | HON. LAWRENCE LEE LITTLE |
| COURT FROM WHICH APPEALED: | TIPPAH COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | JOHN S. GRANT IV |
| | JOHN S. GRANT III |
| ATTORNEY FOR APPELLEE: | JOHN A. FERRELL |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 02/15/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**EMFINGER, J., FOR THE COURT:**

¶1.     On December 2, 2019, Laron Shannon filed a complaint for divorce against his wife Nancy Shannon, alleging habitual cruel and inhuman treatment pursuant to Mississippi Code Annotated section 93-5-1 (Rev. 2018).  Laron's complaint also requested a temporary restraining order (TRO), a preliminary injunction, and permanent injunctive relief against Nancy.  In response to Laron's complaint, on February 5, 2020, Nancy filed a counter-complaint for divorce, also alleging habitual cruel and inhuman treatment against Laron. After a trial on June 10, 2020, the chancery court entered a judgment of divorce on July 15, 2020, wherein Laron was granted a divorce from Nancy based on habitual cruel and inhuman treatment, the marital assets were divided, Nancy was awarded alimony, and a permanent

restraining order was granted prohibiting Nancy from further contact with Laron. Pursuant to the judgment of divorce, a separate judgment divesting title was entered on July 27, 2020, whereby Nancy was divested of all right, title, and interest in the marital home. Aggrieved by the chancellor's decisions, Nancy appealed.

## FACTS AND PROCEDURAL HISTORY

¶2. Laron and Nancy were married on September 19, 2018. After thirteen months of marriage, Nancy moved out of the marital home on October 19, 2019.[1] A little less than two months after Nancy moved out of the marital home, on December 2, 2019, Laron filed a "complaint for divorce, for temporary restraining order and for preliminary and permanent injunction and other relief." Laron's complaint alleged that "shortly after the marriage ceremony . . . Nancy began a course of conduct towards him . . . which amounted to habitual cruel and inhuman treatment." At the time the complaint for divorce was filed, Laron was seventy-seven years old and suffered from Alzheimer's type dementia. Laron's complaint asserted that his medical diagnosis "made it easy for him to be unduly influenced, overreached and emotionally abused by Nancy." According to Laron's complaint,

> [t]he conduct of Nancy towards Laron has been so severe and detrimental to him that immediate and irreparable injury, loss or damage will result to Laron unless the Court issues a Temporary Restraining Order, with or without notice, and ultimately a preliminary and permanent injunction enjoining Nancy from having any contact whatsoever with Laron in person, by telephone or any other form of communication.

_____

[1] Laron's complaint for divorce alleged that the parties' date of separation was October 19, 2019. Nancy's counter-complaint for divorce alleged that the parties' date of separation was October 29, 2019. Regardless of the specific date, Laron and Nancy were married approximately thirteen months, and this fact is not an issue on appeal.

¶3.     At a hearing on December 6, 2019, without notice to Nancy, the chancellor granted Laron's request for a TRO. Two witnesses testified at the hearing, including Laron's daughter, Shea Scott, and a social worker with Adult Protective Services named Erica Hopkins. The TRO set a hearing for a preliminary injunction on January 27, 2020; however, due to multiple agreed continuance orders, the TRO remained in full force and effect until the date of the final divorce trial without an additional hearing.

¶4.     On June 10, 2020, the trial began on Laron's complaint for divorce and Nancy's counter-complaint for divorce.[2] Before the trial began, Nancy's counsel made an ore tenus motion to continue or, alternatively, that Nancy be allowed to testify remotely by telephone. Nancy's counsel argued that Nancy was unable to be present due to financial constraints, COVID concerns, fear of being arrested as a result of the TRO, and a tropical storm. Laron's attorney objected to both Nancy's motion for a continuance and her motion to testify remotely by phone. He argued that the trial had been set for months and that his client was "ready to go." In addition, he argued that Nancy's financial statement indicated that she had sufficient funds to be present for the trial, but even if that were not the case, she should have made arrangements to testify remotely prior to the day of trial. Nancy did not file any pre-trial motions requesting to participate via telephone or any other virtual method. After

_____

[2] Page 16 of the trial transcript states that "[t]he Chancery Court of Lafayette County, Mississippi, was duly and legally convened at 9:30 A.M., **November 28, 2018**." (Emphasis added). The appellee's brief states that the first day of trial was **June 2, 2020**. However, the final "agreed order re-setting" (filed on March 6, 2020), the cover sheet of the trial transcript, and the judgment of divorce state that the trial was held on **June 10, 2020**. This Court recognizes that the November 28, 2018 and June 2, 2020 dates are most likely inadvertent errors but nonetheless not of issue on appeal.

hearing arguments by both attorneys, the chancery court denied both of Nancy's motions, and the trial proceeded as scheduled without Nancy present.

¶5. Laron's counsel called eleven witnesses and had eighteen trial exhibits admitted into evidence in support of his complaint for divorce. Nancy's counsel called Laron adversely as her only witness in an attempt to rebut Laron's proof and to prove the allegations in Nancy's counter-complaint for divorce.

¶6. A judgment of divorce was entered on July 15, 2020, wherein Laron was granted a full and complete divorce from Nancy on the ground of habitual cruel and inhuman treatment. The chancery court granted Laron a 2014 Chevy Silverado and the marital residence. The chancery court granted Nancy a 2016 Acura RDX, an iMac, $32,124.50 previously removed from the parties' joint account, and lump sum alimony in the sum of $26,000. Finally, the court entered a permanent restraining order against Nancy which prohibited her from coming within 1500 feet of Laron or having any contact with him whatsoever. Pursuant to the judgment of divorce, on July 27, 2020, the chancery court entered a separate judgment divesting title, wherein Nancy was divested all of her right, title, and interest in and to the marital residence. Nancy filed her notice of appeal on July 30, 2020.

## STANDARD OF REVIEW

¶7. "It is well settled that appellate courts are bound by a limited standard of review in domestic-relations matters." *White v. White*, 208 So. 3d 587, 592 (¶10) (Miss. Ct. App. 2016) (citing *Ferguson v. Ferguson*, 639 So. 2d 921, 930 (Miss. 1994)). "We will not disturb a chancellor's findings unless [they are] manifestly wrong, clearly erroneous, or an erroneous

legal standard was applied." *Oswalt v. Oswalt*, 981 So. 2d 993, 995 (¶5) (Miss. Ct. App. 2007). This Court is "required to respect the findings of fact made by a chancellor supported by credible evidence and not manifestly wrong." *Mizell v. Mizell*, 708 So. 2d 55, 59 (¶13) (Miss. 1998). Furthermore, "[t]his Court will not substitute its judgment for that of the chancellor '[e]ven if this Court disagree[s] with the lower court on the finding of fact and might . . . [arrive] at a different conclusion. *Owen v. Owen*, 798 So. 2d 394, 397-98 (¶10) (Miss. 2001) (quoting *Richardson v. Riley*, 355 So. 2d 667, 668 (Miss. 1978)). "In the case of a divorce decree, facts will be viewed 'in a light most favorable to the appellee.'" *G.B.W. v. E.R.W.*, 9 So. 3d 1200, 1204 (¶8) (Miss. Ct. App. 2009) (quoting *Bodne v. King*, 835 So. 2d 52, 57 (¶16) (Miss. 2003)). Any legal conclusions of the chancellor are reviewed de novo. *See Armstrong v. Armstrong*, 618 So. 2d 1278, 1280 (Miss. 1993). More specifically, "A chancellor's determination that a spouse's conduct rose to the level of habitual cruel and inhuman treatment is a determination of law, which we review de novo." *Smith v. Smith*, 90 So. 3d 1259, 1262 (¶8) (Miss. Ct. App. 2011).

## ANALYSIS

¶8.     Nancy asserts five arguments on appeal. First, Nancy argues that Laron failed to prove that Nancy committed habitual cruel and inhuman treatment, and therefore the chancery court erred in granting him a divorce on that ground. Secondly, Nancy argues that as a result of Laron's failing to prove habitual cruel and inhuman treatment, the chancery court erred in granting a permanent restraining order against Nancy. Thirdly, based on the same rationale, Nancy asserts that the chancery court erred in entering a separate judgment

5

divesting title. Fourthly (and alternatively), Nancy argues that the chancery court erred by failing to apply the *Ferguson* factors and erroneously divided the property. Finally (and also alternatively), Nancy argues that the chancery court erred by denying Nancy's motion to continue or to allow her to testify remotely. For these reasons, Nancy asserts that the chancery court's judgments should be reversed and rendered or in the alternative reversed and remanded.

## I. Did the chancery court err in granting Laron a divorce on the ground of habitual cruel and inhuman treatment?

¶9. Nancy argues that Laron failed to prove that she committed habitual cruel and inhuman treatment as required by statute to be granted a judgment of divorce. According to Nancy, the testimony "at best, showed nothing more than unkindness, rudeness, incompatibility, or want of affection." She argues that Laron did not testify to any facts sufficient to prove the divorce ground asserted in his complaint, and therefore there was no testimony to be corroborated by any other witness. Further, she asserts that Laron failed to show that there was a causal connection between her alleged actions and any negative impact on his health.

¶10. Mississippi Code Annotated section 93-5-1 provides that "[d]ivorces from the bonds of matrimony may be decreed to the injured party for . . . [h]abitual cruel and inhuman treatment, including spousal domestic abuse" if the injured spouse meets the requisite burden of proof.[3] Further, Section 93-5-1 states in part that spousal domestic abuse may be

---

[3] Mississippi Code Annotated section 93-5-1 was amended in 2017 to enlarge the ground of habitual cruel and inhuman treatment to include and encompass spousal domestic abuse. 2017 Miss. Laws ch. 427, §6 (S.B. 2680). In other words, spousal domestic abuse

established by proving

> [t]hat the injured party's spouse engaged in a pattern of behavior against the injured party of threats or intimidation, **emotional or verbal abuse**, **forced isolation**, sexual extortion or sexual abuse, or stalking or aggravated stalking as defined in Section 97-3-107, if the pattern of behavior rises above the level of unkindness or rudeness or incompatibility or want of affection.

(Emphasis added).

¶11. To be granted a divorce on the ground of habitual cruel and inhuman treatment, the offended spouse must show by a preponderance of the evidence that the offending spouse's conduct either:

> (1) endangers life, limb, or health, or creates a reasonable apprehension of such danger, rendering the relationship unsafe for the party seeking relief, or

> (2) is so unnatural and infamous as to make the marriage revolting to the non-offending spouse and render it impossible for that spouse to discharge the duties of marriage, thus destroying the basis for its continuance.

*Gilmer v. Gilmer*, 297 So. 3d 324, 331 (¶15) (Miss. Ct. App. 2020) (citing *Baggett v. Baggett*, 246 So. 3d 887, 892 (¶13) (Miss. Ct. App. 2017)). Pursuant to statute, the offending spouse's conduct must be something more than "unkindness or rudeness or mere incompatibility or want of affection" and "must be shown to have been systematic and continuous." *Id*. "Divorces based upon habitual cruel and inhuman treatment are necessarily fact-intensive and require a case by case analysis." *Id*. at 827 (citing James Shelson, *Mississippi Chancery Practice* § 38:5 (2019)). "There are many kinds of acts such as wilful

is not a new ground for divorce; it is specifically included in the ground of habitual cruel and inhuman treatment. The amendment also altered the requirement for corroborating testimony so that "[s]pousal domestic abuse may be established through the reliable testimony of a single credible witness, **who <u>may</u> be the injured party** . . . ." *Id*. (emphasis added).

failure to support, verbal abuse, neglect, and the like which, if taken alone will not constitute cruelty, but when taken together will manifest a course of conduct as a whole which may amount to cruelty." *Jackson v. Jackson*, 922 So. 2d 53, 57 (¶7) (Miss. Ct. App. 2006). "In addition, there must be a causal connection between the treatment and the actual or threatened harm to the claimant's health or well-being." *Littlefield v. Littlefield*, 282 So. 3d 820, 824 (¶8) (Miss. Ct. App. 2019). This Court has consistently held that the chancellor must take a dual focus approach and consider both the conduct of the offending spouse and the impact of that conduct on the complaining spouse. *Id*. In applying this two-prong test the standard is subjective rather than a reasonable person standard, "understanding that the impact of the conduct on the complaining spouse is crucial." *Id*. "This subjective inquiry focuses 'on the effect the conduct has on the particular spouse, not its effect on an ordinary, reasonable person.'" *Gilmer*, 297 So. 3d. at 332 (¶15). While this Court recognizes that the complaining spouse must show a causal connection between the conduct of the offending spouse and the harm caused as a result of the conduct, expert medical testimony is not required to substantiate the complaining spouse's claim. *Smith*, 90 So. 3d at 1267 (¶28).

¶12. Dr. Charles F. Elliott was the first witness called by Laron's counsel. Dr. Elliott testified that he had known Laron for almost forty-eight years and had been his primary treating physician for most of that time. Dr. Elliott's medical records were admitted into evidence as Exhibit 1. Dr. Elliott referred Laron to a neurologist as a result of Laron's complaint of memory loss. In turn, Laron was diagnosed with Alzheimer's type dementia. When Dr. Elliott was asked to compare "how Laron appeared as far as his health, as far as

his memory loss between November 1 of '19, and when [he] saw him within the last two weeks [prior to trial]," Dr. Elliott testified that "[h]e is more alert and coherent, [and his] memory seems to have improved." In summary, Dr. Elliott testified that Laron's health had improved after Nancy left the marital home at the end of October 2019.

¶13. Laron's biological daughter, Shea Scott, was Laron's second trial witness. When asked about "a time when [her] father's health seemed to go down," Scott testified that "it went down drastically[;] . . . it was very noticeable after they got married . . . soon after daddy and Nancy married." She went on to testify:

> [H]e couldn't remember anything. He could hardly put one foot in front of the other. When they went out, he practically looked like he went out in what he got up in. I mean, he was pitiful looking and people all over town noticed that. . . . [A]nother thing, he was always very loving towards me, and Lauren and Liz, his stepdaughters. . . . But then when [Nancy] was here and everything was so bad, . . . she got him where he wouldn't even touch us at all like. And we would go up to him and we would hug him, put our arms around him, you know, and he would just stand there like he was scared to even give us a hug. And he was always upset . . . . [H]e just wasn't himself.

According to Scott, Nancy was verbally abusive to Laron. Specifically, she testified that "[Nancy] just stayed on him verbally. She was never happy. Everything he did was wrong."

Scott testified that Nancy's conduct

> made [Laron] nervous, very very nervous. . . . I've already dealt with a situation with this dementia Alzheimer[s] before and I knew what I was looking at. . . . And the stress, when you stay on a person like that, the stress, when you are constantly hollering at somebody like that and you stay on them, the stress will make them diminish even faster.

She also testified that on at least one occasion, Nancy left Laron at a local restaurant because "She would get mad at him and leave." According to Scott, Nancy's behavior isolated Laron

9

from both his friends and family members. She stated that there were several instances when Nancy prevented Laron from seeing his family; one such time was on Father's Day when Laron told Scott that it was best if she did not come over to bring a Father's Day gift. Since Nancy left the marital home in October 2019, Scott testified that "[i]t's unreal how much better he is. Yes, he still has dementia. Alzheimer's is still present. . . . But he has greatly improved. . . . I firmly believe he was on the way to his death if [Nancy] had stayed much longer."

¶14.    Kadie Hall testified as Laron's third witness and corroborated portions of Scott's testimony regarding Nancy's alleged verbally abusive behavior toward Laron. Hall testified to a specific incident that occurred at Shirley's Restaurant, where she was also a patron at the time. According to Hall, she was in a booth beside Laron and Nancy when Nancy began yelling at Laron. She stated,

> I was very concerned. I was sitting there and you couldn't avoid hearing. Nancy was very loud. . . . she was just berating him. And I couldn't believe what I was hearing. So I admit that I sat there longer because I just couldn't believe it. She was telling him, oh, you want somebody else. You are sitting there staring at her. . . . [M]aybe she'll like to clean you up. She'll have to go get your little pills. . . . Let her change your diaper. Just, it was so loud, I couldn't believe it.

Hall described Laron's response to Nancy's comments as non-responsive and his appearance as disheveled. According to Hall, she made a point to get in touch with Laron's daughter to make sure that he was ok after the incident. Hall testified that Laron's appearance on the date of trial looked like the old Laron that she remembered before his marriage to Nancy.

¶15.    Gail Jumper, Laron's housekeeper, testified that she went to Laron and Nancy's home

10

at least once a week to clean the house. When asked if she ever saw any verbal abuse by Nancy toward Laron she stated, "[Y]es, every time I was there." She further testified that there was "a lot of yelling, fussing and cussing on [Nancy's] part. . . . I would go to another part [of the house] because that's not my business." According to Jumper, Nancy used the "'F' word" and demanded that Laron do things her way. Jumper said that Nancy regularly made threats that she was going to leave Laron and would make fun of his incontinence problems, saying she was not "going to clean up after his mess." Jumper stated that Nancy texted her on at least one occasion to come clean the carpet in their bedroom after one such accident. Jumper corroborated Scott's testimony that Nancy isolated Laron from his friends and family and stated that Nancy personally told her that she did not want certain people in the home or that Nancy told Laron to tell them not to come. Jumper testified that in her opinion, Nancy's actions caused Laron's health to deteriorate. When Jumper was asked about Laron's health after Nancy left, she testified that "[Nancy] was gone a week and a-half and [Laron] was totally different. He was walking, going up and down the stairs without help. . . . Now, he's walking like a mile a day. He couldn't have walked to the car without help before." According to Jumper, Laron would not have lived four to five months more if Nancy had remained in the home.

¶16. David Horton, one of Laron's lifelong friends, testified that before Laron's marriage to Nancy, he visited with Laron on a regular basis; however, those visits became fewer and far between after Nancy came into the picture. Horton testified that he witnessed Nancy demean Laron and that Laron appeared to be upset after his arguments with Nancy. Horton

11

also heard Nancy tell Laron that if she left him, his daughters would put him in a nursing home. According to Horton, Laron already seemed anxious on the day that she made that statement, and he believed that the comment definitely bothered Laron. Horton corroborated Jumper's testimony by stating that Nancy continuously threatened to leave the marriage.

¶17. Laron's son-in-law, Matt Bailey, testified they were a closely knit family, and before Laron's marriage to Nancy, the family would have dinner together twice a week; however, after the marriage, the family dinners dwindled down to six dinners total within a ten-month timespan. When Bailey was questioned about the comparison in Laron's health and appearance before the marriage to Nancy and after Nancy left, he testified that

> [Laron] was headed downhill bad. Whether he would have made it another year, I don't know. . . . [T]here was no way he was taking the medicines he was supposed to be taking or getting the meals he was supposed to be needing or getting the sleep and the rest he was needing. Because, I mean, he was just, he looked like he had been drug through a dumpster any time you saw him. And that's not Laron.

¶18. Crystal Brock testified as Laron's seventh witness and corroborated Kadie Hall's testimony regarding Nancy's behavior toward Laron in public and, more specifically, in Shirley's Restaurant. According to Brock, she and her daughter were sitting at a booth close to Nancy and Laron on the night of this particular incident. Brock testified that Nancy was talking loud and said that

> if she moved out that he would move the church-going-whore in there. She kept on saying that quite a few times . . . . And she said maybe I should tell her about your hygiene problems, your bedwetting and that I have to change the sheets every day and your Depends. . . . [Y]ou could tell that it was making Mr. Laron just real embarrassed, just humiliating. And it was very disrespectful, you know, with other people in the restaurant, too, trying to eat.

12

Brock did not hear Laron say anything derogatory to Nancy in response to her comments or at any other time during the incident.

¶19.    Chris Freeman, another one of Laron's sons-in-law, testified as Laron's eighth witness at trial.  Freeman corroborated Bailey's testimony concerning Laron's isolation from family and friends.  Freeman testified that the family welcomed Nancy with open arms when she and Laron got married; however, "she wasn't real open to [them] accepting her.  She didn't care really either way."  Freeman testified that the family had a big closely-knit group of friends that frequently got together, but after Laron and Nancy got married, the group slowly one by one stopped coming around leaving Laron isolated.  According to Freeman, he and his wife continued to go to Laron and Nancy's home to make the best of the situation, but Nancy's verbal abuse toward Laron "excelled over the course of the marriage.  And it was a lot of belittling."  Freeman testified that on two occasions he had to pick up Laron and bring him home from Ripley Sports Grill after Nancy left him without a ride home.

> On the first one, I got a call and she had let him out, let him drive, . . . he had not been driving, was not supposed to be driving.  And he had driven there.  Well, when he got there, he had no idea where he was, how he got there or what he was there for.  So I took him home.  We got him some food and took him home that time.  Well, on another occasion we met, my wife and I, we met Mrs. Nancy and Mr. Shannon there for dinner.  And we may have been there ten minutes and Mr. Shannon turned and [Nancy] started yelling very vulgar words, accusing him of looking at a waitress.  And so she gets up and everybody around is looking at us. . . . Well, she leaves.  We eat dinner.  And Mr. Shannon, I mean, he just, when this would happen, he would just get so upset, I mean, and he would cry.

Freeman also corroborated all of the previous testimony regarding Nancy's threats to leave the marriage.  According to Freeman,

13

[I]t was every other day she was threatening to leave. And the threats to leave really didn't start until after the marriage and then it was about everyday from then on, every other day, and she would threaten to leave and leave. And she would pack her things. . . . [W]e would get calls in the middle of the night, I mean, one and two o'clock in the morning and there would just be screaming. I mean, this is a 77-year-old man. He has no business being up at two in the morning and three in the morning arguing.

Freeman testified that since November 1, 2019, after Nancy left, Laron has been a totally different man.

¶20. Erica Hopkins from Adult Protection Services testified as Laron's ninth witness at trial. She opened an investigation on Laron after an anonymous report was received by the agency on October 22, 2019. According to Hopkins, she visited Laron's home on October 24, 2019, and interviewed Nancy as well as other people in the community regarding the allegations. As a result of her investigation Hopkins testified that she found "substantiated allegations of neglect and verbal abuse to Mr. Laron."

¶21. Laron's remaining two witnesses further corroborated the testimony already presented concerning Nancy's alleged abuse and testified regarding the marital assets to assist the court in equitable division of the marital property.

¶22. While Laron did not testify in his case-in-chief, he was called to testify adversely as Nancy's only witness. Nancy's Rule 8.05 financial statement, *See* UCCR 8.05, was the only exhibit admitted into evidence at trial by Nancy's counsel. It seems clear to this Court that the chancery court discounted Laron's testimony entirely.[4] Nancy produced no testimony to

_____

[4] Within the divorce judgment entered on July 15, 2020, the chancery court stated that "[Laron] was the sole witness called by [c]ounsel for Nancy but it was clear to the [c]ourt that he was not competent to testify." However, the chancery court did not raise any questions concerning Laron's competency to testify at any point during the trial.

14

contradict any of testimony given by the any of the witnesses who testified in Laron's behalf.

¶23. As previously discussed, Mississippi Code Annotated section 93-5-1 was amended in 2017 to enlarge the ground of habitual cruel and inhuman treatment to include spousal domestic abuse. *See supra* note 3. Further, the amendment also altered the requirement for corroborating testimony so that "[s]pousal domestic abuse may be established through the reliable testimony of a single credible witness, **who <u>may</u> be the injured party** . . . ." Miss. Code Ann. §93-5-1 (emphasis added). While Laron did not testify in his case-in-chief, his testimony is simply not required pursuant to the amended statute governing the divorce ground of habitual cruel and inhuman treatment. However, Laron's allegations of habitual cruel and inhuman in his complaint were corroborated by the testimony of eleven witnesses and the exhibits introduced at trial.

¶24. While Nancy asserts that neither of the parties alleged spousal domestic abuse in their pleadings, that is exactly the type of behavior that was alleged in Laron's complaint and that was proved by the testimony of the witnesses and exhibits at trial. Section 93-5-1 states in part that spousal domestic abuse may be proved by a showing "[t]hat the injured party's spouse engaged in a **pattern of behavior against** the injured party of threats or intimidation, **emotional or verbal abuse**, **forced isolation**, sexual extortion or sexual abuse, or stalking . . . ." (Emphasis added). Not only did the witnesses testify that Nancy verbally abused

Additionally, neither Nancy's nor Laron's counsel raised any question of Laron's competency during or after his testimony. Further, the record is devoid of any post-trial motions that raised the issue of Laron's competency to testify. Finally, the chancery court's finding that Laron was incompetent to testify is not an issue on appeal. To the contrary, on appeal Nancy's counsel argues in favor of Laron's competency to further their argument. Therefore, this Court will not further address the issue of Laron's competency to testify.

15

Laron, they testified that because of her behavior, he was isolated from friends and family and that his health and physical appearance suffered as a result. Further, a social worker with Adult Protective Services specifically testified that after her investigation of Laron's case, she found that the allegations of neglect and verbal abuse to Laron were substantiated. The statute only requires a single witness to testify; however, Laron had eleven witnesses testify in his behalf. This Court also recognizes that the chancery court was tasked with analyzing the testimony concerning Nancy's alleged conduct toward Laron, not as it would affect an ordinary reasonable person, but was obligated to analyze Nancy's behavior as it would affect Laron (a seventy-seven year old man with Alzheimer's type dementia). Given the testimony presented by Laron's witnesses at trial and the fact that Nancy presented no credible witnesses to refute such testimony and evidence, this Court finds that the chancery court did not err in granting Laron a divorce on the ground of habitual cruel and inhuman treatment.

**II.    Did the chancery court err in granting Laron a permanent restraining order against Nancy?**

¶25.    Laron's complaint for a divorce included a request for a temporary restraining order, a preliminary injunction and a permanent injunction to protect Laron from immediate and irreparable injury as a result of Nancy's abusive conduct toward him. A hearing was conducted on December 6, 2019, without notice to Nancy. Laron's daughter, Shea Scott, and Erica Hopkins, a social worker with Adult Protective Services testified at the hearing. As a result of that testimony, the chancellor entered a temporary restraining order. This temporary restraining order was continued in effect, by the agreement of the parties, until the issue of a permanent injunction could be heard with the trial of the complaint for divorce.

16

¶26. After the trial, the chancellor found that Nancy's constant negligent and abusive conduct toward Laron did endanger his health, rendering the relationship unsafe. The court found a causal connection between Nancy's behavior and Laron's drastic decline in health while in her care. The chancellor further found that Laron's health and appearance improved after their separation. As a result, the court granted Laron a divorce from Nancy on the ground of habitual cruel and inhuman treatment. The chancellor also granted a permanent restraining order against Nancy.

¶27. Nancy and the dissent argue that the evidence was insufficient to support the issuance of a permanent restraining order pursuant to Mississippi Rule of Civil Procedure 65. Further, both Nancy and the dissent contend that Rule 65 was not a proper authority for a permanent restraining order. The cases cited in support of their arguments are distinguishable from the present case.

¶28. In *Pratt v. Nelson*, 170 So. 3d 620 (Miss. Ct. App. 2015), Nelson sought an abuse protection order against Pratt under the Domestic Abuse Protection Act (PDAL). *Id*. at 624 (¶16). At the conclusion of the trial in that matter, the chancellor issued a Rule 65 injunction against Pratt. Pratt appealed the decision. *Id*. at 623 (¶10). Both Pratt and Nelson agreed that the chancellor erred in granting a Rule 65(b) restraining order or injunction because Nelson did not request relief under Rule 65. *Id*. at 624-25 (¶16). This Court agreed and found that there is "no precedent for converting a domestic violence protection order into a Rule 65 injunction." *Id*. at 625 (¶18).

¶29. In *Waite v. Adkisson*, 282 So. 3d 744 (Miss. Ct. App. 2019), Waite filed a petition for

17

a domestic abuse protection order under the PDAL. *Id*. at 745 (¶1). Instead of granting relief under the PDAL, the chancellor granted a "permanent restraining order" under Rule 65. *Id*. Again this Court found the grant of relief under Rule 65 to be improper. *Id*. at 751 (¶20) The matter was remanded to the trial court for a decision as to whether relief should be granted under the PDAL. *Id*.

¶30. The present case is fundamentally different than *Pratt* and *Waite*. Laron did not seek relief pursuant to the PDAL. Instead, Laron sought injunctive relief under Rule 65 as a part of his complaint for a divorce. This Court also said in *Waite*:

> Pratt correctly recognized that a permanent restraining order cannot be issued based solely on the authority of Rule 65, which is a rule of procedure. Id. Permanent injunctive relief may be granted only to protect and prevent the violation of some substantive "legal right." *See Tallahatchie Valley Elec. Power Ass'n v. Miss. Propane Gas Ass'n Inc.*, 812 So. 2d 912, 927 (¶50) (Miss. 2002) (footnote omitted). **A permanent "injunction is a 'remedy potentially available only after a plaintiff can make a showing that some independent legal right is being infringed—if the plaintiff's rights have not been violated, he is not entitled to any relief, injunctive or otherwise**.'" *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1127 (11th Cir. 2005) (quoting *Klay v. United Healthgroup Inc.*, 376 F.3d 1092, 1098 (11th Cir. 2004)); *see also*, e.g., *Reyes v. N. Tex. Tollway Auth.*, 861 F.3d 558, 565 n.9 (5th Cir. 2017) (**stating that a claim for injunctive relief is not "freestanding" and "must be supported by some underlying cause of action"**).

*Waite*, 282 So. 3d at 750 (¶17) (emphasis added). Here Laron's claim was not "freestanding." His claim for injunctive relief was a part of his "underlying cause of action" for a divorce on the grounds of habitual cruel and inhuman treatment. Laron had an "independent legal right" to be free from abuse at the hands of Nancy. Once the chancellor found that the evidence was sufficient to support a divorce on that ground, the same evidence

18

was sufficient to support a permanent restraining order under Rule 65. The chancellor committed no error in issuing the permanent restraining order under the facts of this case.

### III. Did the chancery court err in entering a separate judgment divesting title?

¶31. Nancy's sole argument in support of reversing the chancery court's judgment divesting title is based on the premise that because Laron's divorce was granted in error and therefore void, so is any judgment stemming from the underlying void judgment. Because we find no error in the chancery court's decision to grant Laron's divorce, Nancy's argument regarding the separate judgment divesting title is without merit.

### IV. In the alternative, did the chancery court fail to apply the *Ferguson* factors and erroneously divide the property?

¶32. Nancy asserts that if the judgment of divorce is not "deemed void," or, in the alternative, the chancery court committed reversible error by failing to apply the *Ferguson* factors in its division of property. Nancy argues that she should have been awarded a portion of Laron's director's fees earned during the marriage, and that the chancery court's division of property as a whole was "grossly unequal" in part by not awarding her any interest in the marital home; therefore, she contends the judgment of divorce should be reversed.

¶33. "The division of marital assets is governed by *Hemsley v. Hemsley*, 639 So. 2d 909 (Miss. 1994), and *Ferguson v. Ferguson*, 639 So. 2d 921 (Miss. 1994)." *McBride v. McBride*, 110 So. 3d 356, 359 (¶20) (Miss. Ct. App. 2013). The chancery court is first tasked with determining which assets are considered marital property or non-marital property pursuant to *Hemsley* and then divide the marital property considering the factors set forth in *Ferguson*.

19

*Id*. The *Ferguson* factors are:

1. Substantial contribution to the accumulation of the property. Factors to be considered in determining contribution are as follows:

a. Direct or indirect economic contribution to the acquisition of the property;

b. Contribution to the stability and harmony of the marital family relationships as measured by quality, quantity of time spent on family duties and duration of the marriage; and

c. Contribution to the education, training or other accomplishment bearing on the earning power of the spouse accumulating the assets;

2. The degree to which each spouse has expended, withdrawn or otherwise disposed of material assets and any prior distribution of such assets by agreement, decree or otherwise;

3. The market value and emotional value of the assets subject to such distribution;

4. The value of the assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse;

5. Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution;

6. The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties;

7. The needs of the parties for financial security with due regard to the combination of assets, income and earning capacity; and,

8. Any other factor which in equity should be considered.

*Ferguson*, 639 So. 2d at 928 (punctuation altered). "Chancellors are to evaluate the division

20

of marital assets by the [*Ferguson*] guidelines, and should support their decisions with findings of fact and conclusions of law for purposes of appellate review." *Weathersby v. Weathersby*, 693 So. 2d 1348, 1354 (Miss. 1997). In *Weathersby*, the Mississippi Supreme Court noted that "the Chancellor need not make findings as to **each and every** factor set forth in *Ferguson*, but rather the Chancellor may consider **only those factors he finds 'applicable'** to the property in question." *Id*. (emphasis added).

¶34. In this case, the chancellor did in fact enter a judgment of divorce that included a findings of fact and conclusions of law. The judgment of divorce included an extensive recitation of the law to be considered by the court concerning "property division," "classification of assets," and "factors to evaluate division of marital assets." Within that portion of the judgment, the chancery court not only mentioned *Hemsley* and *Ferguson* by name, but the court went even further to quote all eight factors set forth in *Ferguson* verbatim. In the section of the judgment titled "Conclusions of Law," the chancery court explained with specificity why Laron was entitled to marital home. The court stated in part:

> Proof was provided that Laron purchased land and built his home almost twenty years before he married Nancy. No testimony was provided that would indicate that Nancy made any contribution to the care and maintenance of the home. The evidence also showed that she contributed little, if anything, in the way of homemaking duties. Laron had a housekeeper and handy man to take care of the home who had been doing so for many years before the marriage. Also Laron and Nancy would eat out at least twice a day indicating that Nancy did not prepare meals for Laron. There were also incidents when Nancy would call the housekeeper to the house to clean up a mess on the housekeeper's day off. Because of the short length of the marriage and her total lack of contribution to the household in addition her abuse and neglect of Laron, this Court finds that Nancy is not entitled to any interest or equity in the marital home. Therefore Laron is awarded exclusive use and possession of the marital home.

21

It is clear to this Court that the chancery court considered multiple factors set forth in *Ferguson* in determining the disposition of the marital home including contribution to the asset, the length of the marriage, and Nancy's abuse and neglect of Laron. Further, the chancery court addressed the disparity of incomes and the parties' separate estates in a separate paragraph concerning alimony. That paragraph stated in part:

> Alimony is typically awarded in cases of a long marriage where the payor's assets were accumulated by way of some form of contribution from the recipient. In this case we have neither a long marriage nor any contribution on the part of Nancy Shannon. However, because Nancy has no income and a much smaller separate estate, the Court finds it appropriate to make some award to Nancy. Therefore, Nancy is awarded lump sum alimony in the amount of $26,000.00. This award should cover her living expenses for thirteen (13) months, which is equal to the length of time from marriage of the parties to separation.

Within the totality of the judgment of divorce, it is clear that the chancery court considered the parties' contribution to the marital home, length of the marriage, Nancy's abuse and neglect of Laron, and the parties' incomes and separate estates. It is important to note again that Nancy did not appear for the trial and her counsel put on no other witnesses at trial other than Laron. Nancy's Rule 8.05 financial statement was entered into evidence; however, the court heard no testimony from anyone to attest to its accuracy. Because the chancery court is not obligated to make a finding as to each and every *Ferguson* factor and because the court did in fact explain its considerations prior to the division award based on the testimony presented at trial, we find no error in the chancery court's application of the *Ferguson* factors and the division of assets.

¶35. Likewise, we find Nancy's argument that she should have been awarded a portion of

Laron's earned director's fees is without merit. The chancery court heard only from Laron's witnesses regarding Laron and Nancy's assets. Joseph Kyle Smith testified that Laron's director's fees would have been deposited into his "main account." He further testified that "[t]his would have been his general account that he would have used to pay his bills and et cetera." Presumably, the income that Laron received in the form of director's fees was being used for Nancy's benefit during the marriage to pay utility bills, to cover the cost of the meals that they ate at restaurants, and the like. Further, Smith testified that this account was closed at the time of the trial. Nancy provided no evidence at trial that there were any director's fees that could be distributed. For these reasons, we find Nancy's argument is without merit.

**V.  Did the chancery court err in denying Nancy's ore tenus motion for continuance or, in the alternative, allow her to participate remotely?**

¶36.    Nancy argues that she suffered "manifest injustice" as a result of the chancery court denying her motion for continuance or, in the alternative, to allow her to participate remotely. Nancy's counsel made an ore tenus motion on the day of trial requesting a continuance for a variety of reasons, including financial constraints, concerns with COVID, a tropical storm, and fear of being arrested as a result of an existing TRO.

¶37.    "It is well settled that the decision to grant or deny a motion for a continuance is within the sound discretion of the trial court and will not be reversed unless the decision results in manifest injustice." *Lewis v. Jackson Cnty. Youth Ct.* (In *re E.G.*), 191 So. 3d 763, 775 (¶37) (Miss. Ct. App. 2016) (internal quotation marks omitted). "Prejudice must result from the denial in order to have that decision reversed." *Kaiser v. Kaiser*, 281 So. 3d 1136,

23

1144 (¶33) (Miss. Ct. App. 2019) (citing *Henderson v. Henderson*, 952 So. 2d 273, 277 (¶7) (Miss. Ct. App. 2006)).

¶38.   In this case, the parties had previously executed and filed two agreed orders of continuance as far back as January 27, 2020, and within those orders, a new trial date was set each time.  Not once between the outbreak of COVID-19 in March 2020 and the trial date, June 10, 2020, did Nancy file a motion to be allowed to participate in the trial remotely due to COVID-19 concerns or concerns regarding an existing TRO.  Nor did she take any affirmative steps to set up a "zoom call" or video conference to facilitate her remote participation.  Instead, she waited until the day of trial when Laron was prepared and ready for trial to make known her concerns to the chancery court.  Nancy's attorney did not elaborate or give any specific details on why Nancy could not be present for trial, such as proof of specific restrictions placed on her travel by an employer or doctor or proof of damage caused to her personal property due to a tropical storm that would prevent her from traveling.  While Nancy claimed financial constraints, her Rule 8.05 financial statement, which was admitted into evidence at trial, showed sufficient funds in her checking and savings accounts to pay for travel arrangements.  In short, Nancy provided absolutely no proof to substantiate her request for a continuance or her request to participate in the trial remotely; instead, she waited until the day of trial to make her requests without filing a proper motion.  Any disadvantage or prejudice that Nancy suffered by not being present for the trial was a result of her own actions.  For these reasons, the chancery court did not err in denying Nancy's motion for continuance, or in the alternative, request to participate

24

remotely.

## CONCLUSION

¶39.    After review of the record, we find no error by the chancery court in granting Laron's complaint for a divorce on the ground of habitual cruel and inhuman treatment. As such, we find no error in the chancery court awarding Laron a permanent restraining order against Nancy and entering a separate judgment divesting title. We also find no merit in Nancy's arguments that the chancery court failed to appropriately apply the *Ferguson* factors in dividing the property or by denying her motion to continue, or in the alternative, to participate in the trial remotely.

¶40.    **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND SMITH, JJ., CONCUR. WILSON, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION.**

**WILSON, P.J., CONCURRING IN PART AND DISSENTING IN PART:**

¶41.    I concur with the majority that the grant of a divorce and the financial aspects of the final judgment of the chancery court should be affirmed. However, for the reasons explained below, I would hold that the chancellor erred by entering a permanent restraining order against Nancy, and I would reverse the final judgment to that limited extent. Accordingly, I respectfully concur in part and dissent in part.

¶42.    Under the Protection from Domestic Abuse Law (PDAL), Miss. Code Ann. §§ 93-21-1 to -33 (Rev. 2018), "[a]ny person may seek a domestic abuse protection order for himself by filing a petition alleging abuse by the respondent." Miss. Code Ann. § 93-21-7(1)

25

(Supp. 2020). The PDAL defines "Abuse" to include

the occurrence of one or more of the following acts between spouses, former spouses, persons living as spouses or who formerly lived as spouses, persons having a child or children in common, other individuals related by consanguinity or affinity who reside together or who formerly resided together or between individuals who have a current or former dating relationship:

(i)     Attempting to cause or intentionally, knowingly or recklessly causing bodily injury or serious bodily injury with or without a deadly weapon;

(ii)    Placing, by physical menace or threat, another in fear of imminent serious bodily injury;

(iii)   Criminal sexual conduct committed against a minor within the meaning of Section 97-5-23;

(iv)    Stalking within the meaning of Section 97-3-107;

(v)     Cyberstalking within the meaning of Section 97-45-15; or

(vi)    Sexual offenses within the meaning of Section 97-3-65 or 97-3-95.

"Abuse" does not include any act of self-defense.

Miss. Code Ann. § 93-21-3(a) (Rev. 2018).

¶43.    A court may enter a "final domestic abuse protection order" only if, after a hearing, the court "find[s] that the petitioner has proved the existence of abuse by a preponderance of the evidence[.]" Miss. Code Ann. § 93-21-15(2)(a) (Supp. 2019). "Every [final] domestic abuse protection order . . . shall set forth the reasons for its issuance, shall contain specific findings of fact regarding the existence of abuse, shall be specific in its terms and shall describe in reasonable detail the act or acts to be prohibited." *Id.* § 93-21-15(3). A final protection order shall be provided to the sheriff and entered in the statewide "Mississippi

26

Protection Order Registry" maintained by the Attorney General. *Id.* § 93-21-15(5); *see* Miss. Code Ann. § 93-21-25(1) (Rev. 2018). A knowing violation of a protection order is "a misdemeanor punishable by imprisonment in the county jail for not more than six (6) months or a fine of not more than One Thousand Dollars ($1,000.00), or both." Miss. Code Ann. § 93-21-21(1) (Supp. 2020). Alternatively, a knowing violation may be punished as criminal contempt. *Id.* § 93-21-21(2).

¶44. In *Pratt v. Nelson*, 170 So. 3d 620 (Miss. Ct. App. 2015), Nelson sought a domestic abuse protection order against her sister (Pratt) after Pratt threatened and stalked Nelson and other members of Nelson's family. *Id.* at 621-22 (¶¶3-4). After a trial, the chancellor entered a final order granting an injunction against Pratt under Rule 65 of the Mississippi Rules of Civil Procedure and restrained Pratt from contacting or coming within 100 feet of Nelson and other members of Nelson's family. *Id.* at 623 (¶10). The chancellor's final order did not adjudicate Nelson's request for a domestic abuse protection order under the PDAL but simply granted a "Rule 65 injunction." *Id.* at 624 (¶14) & n.6. On appeal, this Court held that the chancellor erred by entering an injunction under Rule 65 because "Nelson only requested relief under the [PDAL], not under Rule 65." *Id.* at 624-25 (¶16). This Court reasoned that

> Rule 65 is not the proper vehicle for imposing a permanent restraining order; it is designed to afford temporary relief when irreparable harm occurs. . . . [T]here is no precedent for converting a domestic violence protection order into a Rule 65 injunction; neither the statute nor the rule contemplates this action. Under this case's procedural posture, Nelson was either entitled to relief under the [PDAL] or not.

*Id.* at 625 (¶17).

27

¶45.    In *Waite v. Adkisson*, 282 So. 3d 744 (Miss. Ct. App. 2019), Waite filed a petition for a domestic abuse protection order under the PDAL against her ex-boyfriend (Adkisson). *Id.* at 747 (¶6).  Waite's petition also cited Rule 65.  *Id.*  After a trial, the chancellor ultimately granted Waite a "permanent restraining order" under Rule 65.  *Id.* at 749 (¶14).  The special master who presided over the trial and prepared the chancellor's order specifically found that "because of the testimony, . . . it would be best to go under Rule 65 instead of [the PDAL]," and as a result, the trial court neither granted nor denied Waite's request for a domestic abuse protection order under the PDAL.  *Id.* at 748-49 (¶¶12, 14).  On appeal, this Court held that just as in *Pratt*, the chancellor erred by granting a restraining order under Rule 65 and failing to address Waite's request for a domestic abuse protection order under the PDAL.  *Id.* at 749-50 (¶¶15-18).  This Court reasoned:

> *Pratt* correctly recognized that a permanent restraining order cannot be issued based solely on the authority of Rule 65, which is a rule of procedure. Permanent injunctive relief may be granted only to protect and prevent the violation of some substantive legal right.  A permanent injunction is a remedy potentially available only after a plaintiff can make a showing that some independent legal right is being infringed—if the plaintiff's rights have not been violated, he is not entitled to any relief, injunctive or otherwise.
>
> In this case, Waite did allege an independent legal right and cause of action under the PDAL.  Indeed, the PDAL not only provides a right and cause of action but also a complete scheme for the issuance of injunctive relief in the form of emergency, temporary, and final domestic abuse protection orders. Therefore, resorting to Rule 65 is entirely unnecessary in the case of a petition filed under the PDAL. As we explained in *Pratt*, a petitioner who seeks a domestic abuse protection order under the PDAL is either entitled to relief under the PDAL or not.

*Id.* at 750 (¶¶17-18) (citations, footnote, quotation marks, and brackets omitted).  We reversed and held that on remand the chancellor was required to find whether Waite could

28

prove "domestic abuse by a preponderance of the evidence, as required by the PDAL." *Id.* at 751 (¶20). We further held that if the chancellor found that Waite had proved her case, then the chancellor was required to enter a final domestic abuse protection order that satisfied the requirements of the PDAL. *Id.*

¶46. In the present case, Laron's complaint alleged that Nancy had "emotionally abused" and "verbally abused" him, and in addition to a divorce, Laron asked for a temporary restraining order (TRO) and "a preliminary and permanent injunction enjoining Nancy from having any contact whatsoever with [him] in person, by telephone or any other form of communication." Laron specifically asked that Nancy be permanently enjoined from "coming within 1500 feet of him or coming on the marital home property." The chancellor initially entered a TRO against Nancy without notice, which by agreement remained in effect through trial. Laron's request for a permanent injunction was not mentioned during the trial. However, in the final judgment, the chancellor permanently enjoined Nancy "from coming within 1500 feet of Laron . . . or having any contact with him whatsoever including, but not limited to contact by telephone, text message, e-mail or other electronic method." The judgment directed counsel for Laron to prepare "a separate order which [could] be entered and provided to the necessary law enforcement agencies."

¶47. The procedural posture of this case is different from *Pratt* and *Waite* in that Laron sought a permanent restraining order within a complaint for a divorce rather than in a petition under the PDAL. Nonetheless, it remains true that Rule 65 is only "a rule of procedure" and that "[p]ermanent injunctive relief may be granted only to protect and prevent the violation

29

of some substantive legal right." *Waite*, 282 So. 3d at 750 (¶17) (quotation marks omitted). Therefore, to obtain a permanent injunction, a party must first show a threatened violation of "some independent legal right." *Id.* In addition, "for a permanent injunction to be granted, a party must show an imminent threat of irreparable harm." *A-1 Pallet Co. v. City of Jackson*, 40 So. 3d 563, 569 (¶20) (Miss. 2010) (quotation marks omitted).

¶48. The evidence at trial did not establish that Nancy needed to be restrained to prevent the violation of any of Laron's legal rights. The chancellor granted Laron a divorce based on evidence that Nancy had been verbally or emotionally abusive during their marriage; had "frequently threatened to leave" Laron, which "upset" him; and had "neglected" Laron by failing to take proper care of him. I concur with the majority that the totality of the evidence was sufficient to support the grant of a divorce. However, the evidence did not establish "abuse" under the PDAL (*see supra* ¶42; Miss. Code Ann. § 93-21-3(a)) or a violation of any other "independent legal right" that would entitle Laron to permanent injunctive relief. *Waite*, 282 So. 3d at 750 (¶17). For that reason alone, the chancellor erred by granting a permanent restraining order against Nancy.

¶49. Moreover, the evidence also did not establish any continuing threat of irreparable harm. *A-1 Pallet Co.*, 40 So. 3d at 569 (¶20). Nancy's pre-divorce threats to leave and her failure to care for Laron were no longer an issue once she left the marital home and was no longer responsible for Laron's care. Furthermore, no evidence was presented that Nancy had ever attempted to contact Laron after she left the marital home. In fact, Laron testified that he had called Nancy several times since she left. A permanent restraining order should not

30

have been entered against Nancy because there was no showing that it was needed to prevent irreparable harm. *Id.*

¶50.    A permanent restraining order should not be granted lightly or as a matter of course in every divorce in which one spouse's conduct rises to the level of habitual cruel and inhuman treatment. The party restrained faces not only a risk of citation for civil or criminal contempt but also a social stigma. The evidence in this case did not establish any legal basis for a permanent restraining order or any ongoing threat of irreparable harm. Accordingly, I respectfully dissent from the majority's affirmance of the permanent restraining order. I concur that the remainder of the final judgment of divorce should be affirmed.